UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES FOLEY,<br>　　　*Plaintiff*,<br><br>　　v.<br><br>TOWN OF MARLBOROUGH and<br>AMY TRAVERSA,<br>　　　*Defendants.* | No. 3:19-cv-01481 (VAB) |

RULING AND ORDER ON MOTION TO COMPEL AND
MOTIONS FOR SUMMARY JUDGMENT

James Foley ("Plaintiff") has sued the Town of Marlborough and Amy Traversa,

individually, (collectively, "Defendants") following his termination from employment, for

interference in violation of the Family Medical Leave Act ("FMLA") under 29 U.S.C. § 2601 *et*

*seq.* and retaliation in violation of the FMLA under 29 U.S.C. § 2612(a)(1) *et seq.* Am. Compl.,

ECF No. 36 (Mar. 9, 2020) ("Am. Compl."). The Town of Marlborough has also filed a motion

to compel Indeed, Inc. ("Indeed") to provide documents requested in its subpoena and to provide

an affidavit authenticating the documents.

Defendants have moved for summary judgment on both FMLA claims.

Mr. Foley also has cross-moved for partial summary judgment on his interference claim.

For the following reasons, the Town of Marlborough's motion to compel is **DENIED**.

Defendants' motion for summary judgment is **DENIED**. Plaintiff's cross-motion for partial

summary judgment is **DENIED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

The Town of Marlborough hired Mr. Foley on or about July 31, 1996, as a maintainer in the public works department. Pl.'s Local R. 56(a)(2) Statement in Opp'n to Defs.' Mot. for Summ. J. ¶ 1, ECF No. 120-1 (Jan. 21, 2022) ("Pl.'s 56(a)(2) Statement"). His duties included "driving trucks to transport materials, remove trash, and plow and sand roads," as well as "general work in the construction, repair, and maintenance of town roads, bridges, grounds, and facilities." *Id.*

Mr. Foley was at all times employed in the Public Works Department, in various roles. Am. Compl. ¶ 3.

Ms. Traversa served as the Town of Marlborough's First Selectman beginning in November of 2015. Pl.'s 56(a)(2) Statement ¶ 2; Defs.' Local R. 56(a)(2) Statement of Facts in Opp'n to Summ. J. for Pl. ¶ 10, ECF No. 119-1 (Jan. 21, 2022) ("Defs.' 56(a)(2) Statement"). She held that role when the Town of Marlborough fired Mr. Foley. Pl.'s 56(a)(2) Statement ¶ 2.

Haley Wagner worked for the Town of Marlborough from 2000 to November 2021. During this time, she served as assistant treasurer and finance director, roles which included human resources functions. Pl.'s 56(a)(2) Statement ¶ 3.

---

[1] To determine the undisputed facts in this case, the Court relies upon the parties' Local Rule 56(a) Statements (to the extent that they comply with the Federal Rules of Civil Procedure and the Local Rules of this District) and evidence cited therein. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(2), 56(a)(3).

The Town of Marlborough is a municipality and political subdivision of the State of Connecticut. Defs.' 56(a)(2) Statement ¶ 7. It is also an employer as defined in 29 U.S.C. § 2611(4). *Id.* ¶ 8.

The parties agree that, during his employment by the Town of Marlborough, Mr. Foley "was disciplined including verbal warnings, written warnings and suspensions," and that "the suspensions included multi-day suspensions in 2007, 2017, and. 2019" Pl.'s 56(a)(2) Statement ¶ 5. Defendants, however, claim that "[a] number of [Mr. Foley's] instances of discipline were the result of failure to timely request leave from work or provide appropriate notice of a need for leave and unauthorized absences from work, among other reasons." Defs.' Local R. 56(a)(1) Statement of Undisputed Fasts in Supp. of Mot. for Summ. J. ¶ 5, ECF No. 107-1 (Dec. 3, 2021) ("Defs.' 56(a)(1) Statement"). Mr. Foley claims that he was disciplined for "unexcused absences and leaving work without prior authorization" and not for "failure to timely request leave from work or provide appropriate notice of a need for leave." Pl.'s 56(a)(2) Statement ¶ 5.

On January 17, 2017, Mr. Foley, by e-mail, submitted his first request for leave under the FMLA. Ex. A to Defs.' Mot. for Summ. J. at 2, ECF No. 107-7 (Dec. 3, 2021) ("Ex. A"). Mr. Foley attached to his request a November 2018 letter from a medical doctor, which asked that he be excused from work because of "'his significant difficulty with tinnitus.'" Pl.'s 56(a)(2) Statement ¶ 6 (quoting Ex. A at 3). On January 24, 2017, Ms. Traversa sent Mr. Foley an e-mail stating that a request for leave under the FMLA requires a specific application "and must include the job description" on file for the applicant. Pl.'s 56(a)(2) Statement ¶ 7. Her e-mail included a U.S. Department of Labor Certification of Health Care Provider for Employee's Serious Health Condition ("Certification Form"), "to be filled out by [Mr. Foley] and a health care provider." Defs.' 56(a)(1) Statement ¶ 7.

On March 28, 2017, Mr. Foley returned the completed Certification Form, signed by Dr. Jeffrey Sawyer. Pl.'s 56(a)(2) Statement ¶ 8. Dr. Sawyer indicated that "the employee [is] unable to perform any of his/her job functions due to the condition," Ex. B to Defs.' Mot. for Summ. J. at 5, ECF No. 107-8 (Dec. 3, 2021), and that Mr. Foley would not "be incapacitated for a single continuous period of time due to his . . . medial condition, including any time for treatment and recovery." *Id.* at 6. The Certification Form also stated that Mr. Foley would "need to attend follow-up appointments or work part-time or on a reduced schedule because of [his] medical condition" and that the condition would not "cause episode flare-ups periodically preventing [Mr. Foley] from performing his . . . job functions." *Id.* at 6. In the field asking that the physician "identify the job functions the employee is unable to perform," Dr. Sawyer wrote, "[b]ecause of Hrg loss, Pt needs to avoid noise exposure[.] Also has dif[ficulty] hearing in . . . . Has dif[ficulty] sleeping and has tinnitus." *Id.* at 5.

On April 5, 2017, Ms. Traversa drafted a letter to Dr. Sawyer stating that his responses on the Certification Form "do not provide enough specificity to allow [the Town of Marlborough] to make a determination on how to proceed with Mr. Foley's request for intermittent medical leave under the FMLA." Ex. C to Defs.' Mot. for Summ. J. at 2, ECF No. 107-9 (Dec. 3, 2021) ("Ex. C"); *see also* Pl.'s 56(a)(2) Statement ¶ 9. The letter requested" additional specific information regarding the likely frequency and duration of Mr. Foley's inability to perform the essential functions of his job, and if there are any medically necessary work restrictions." Ex. C at 2. The letter also noted an inconsistency in the Certification Form, which indicated that Mr. Foley would have to attend follow-up treatment appointments or work part time or on a reduced schedule but also notes that treatments or reduced hours are not medically necessary. Ex. C at 2. The letter stated that "[u]ntil the Town [of Marlborough] receives the specific information from

you that is necessary to address Mr. Foley's request for leave under the FMLA, [the town of Marlborough] will be unable to address his request." Ex. C at 3.

On April 6, 2017, Ms. Traversa sent Mr. Foley an e-mail detailing the deficiencies in Dr. Sawyer's Certification Form. Pl.'s 56(a)(2) Statement ¶ 10; Ex. ZZ to Defs.' Mot. for Summ. J., ECF No. 107-58 (Dec. 3, 2021) ("Ex. ZZ"). The e-mail from Ms. Traversa stated, "[b]efore we can address your request for medical leave under FMLA, we will need additional information," and notes that a copy of Mr. Foley's job description would be forwarded to Dr. Sawyer, "along with a letter requesting more specific and clear answers, so he can resubmit the form and provide the Town with the information necessary to address [Mr. Foley's] request for leave under FMLA." Ex. ZZ at 2. Specifically, the e-mail requested that Dr. Sawyer provide details on the functions of the job that Mr. Foley would be unable to perform. *Id.* The e-mail ended with, "[o]nce we receive the specific information needed from Dr. Sawyer, we will be able to address your request." *Id.*

On April 21, 2017, Dr. Sawyer informed Ms. Traversa that the main issue was Mr. Foley's "'ability to minimize noise trauma at work,'" and that "'[a]s long as OSHA standards are maintained patient should be able to continue work with appropriate noise protection.'" Pl.'s 56(a)(2) Statement ¶ 11 (quoting Ex. D to Defs.' Mot. for Summ. J., ECF No. 107-10 (Dec. 3, 2021) ("Ex. D")); *see also* Ex. D at 2 ("I believe the main issue for patient is not the follow-up and loss of time from work due to follow up appointments but rather his ability to minimize noise trauma at work.").

On April 27, 2017, Ms. Traversa informed Mr. Foley that the Town of Marlborough had received supplemental information from Dr. Sawyer and that based on the information provided, Mr. Foley's FMLA leave was denied because his "'current condition does not satisfy the criteria

set forth under the FMLA for intermittent leave.'" Pl.'s 56(a)(2) Statement ¶ 12 (quoting Ex. E to Defs.' Mot. for Summ. J., ECF No. 107-11 (Dec. 3, 2021) ("Ex. E")). Defendants claim that Mr. Traversa "confirmed that [Mr. Foley] had been provided with appropriate OSHA-advised hearing protection," which Mr. Foley denies. Defs.' 56(a)(1) Statement ¶ 12; Pl.'s 56(a)(2) Statement ¶ 12. Ms. Traversa's April 27, 2017 letter stated,

> As you know, all practical OSHA advised ear protection has been provided to you by the Town. However, if you feel you require additional ear protection, please feel free to speak with your supervisor, Tony Gallicchio, about it.

Ex. E at 2.

On July 24, 2017, Defendants received a letter from Dr. Sawyer, dated November 9, 2016, which asks to "[p]lease excuse patient from his work schedule secondary to this significant duty with tinnitus." Ex. F to Defs.' Mot. for Summ. J., ECF No. 107-12 (Dec. 3, 2021). The letter stated that "[b]ecause of the difficulty with ringing [in the ear] patient loses significant amount of sleep which causes him to have difficulty at work and lose time from work." *Id.* at 4.

On August 4, 2017, Mr. Foley sent an e-mail to Ms. Traversa containing a July 25, 2017 letter from Dr. Sawyer relating to his tinnitus. *Id.* at 2. Mr. Foley's e-mail asked Ms. Traversa to let him know "if the letter attached satisfies [his] Employer's needs to approve [his] leave under FMLA." *Id.* Dr. Sawyer's letter stated that Mr. Foley had "informed [Dr. Sawyer] that there are days that his symptoms both with hearing loss and ringing increased and that he has to periodically take days and time off from work." *Id.* at 3. The letter stated that "it is not inconceivable that patient may need periodic timeout from work secondary to increase symptoms of hearing loss as well as ringing." *Id.*

On August 7, 2017, Ms. Traversa sent Mr. Foley "a letter informing him that Dr. Sawyer would need to fill out a Certification Form, specifically noting that he should answer questions

fully." Pl.'s 56(a)(2) Statement ¶ 14 (citing Ex. G to Defs.' Mot. for Summ. J., ECF No. 107-13 (Dec. 3, 2021)). Ms. Traversa "included a Certification Form and a list of essential functions of [Mr. Foley's] job." *Id.*

From August 11, 2017 to August 29, 2017, Ms. Traversa and Dr. Sawyer exchanged communications regarding Mr. Foley's condition. Pl.'s 56(a)(2) Statement ¶ 15. The parties agree that Dr. Sawyer said Mr. Foley felt as though he could not perform any job function when he had a flareup. Pl.'s 56(a)(2) Statement ¶ 15. The Court's own review of the documents shows that on August 11, 2017, Ms. Traversa wrote a letter to Dr. Sawyer requesting that he complete a Certification Form so that the Town of Marlborough could "address Mr. Foley's request for leave under the FMLA." Ex. H to Defs.' Mot. for Summ. J. at 3, ECF No. 107-14 (Dec. 3, 2021). The letter also asked that Dr. Sawyer provide "the basis of [his] medical opinion" for whether Mr. Foley had progressive hearing loss, and also whether in his medical opinion there were "other types of activities or maladies [that] can be causing Mr. Foley's current symptoms" given that "OSHA standards have been maintained and appropriate noise protection has been provided to Mr. Foley." *Id.* at 3–4. On August 15, 2017, Dr. Sawyer wrote to Mr. Traversa indicating that during the March 30, 2015 consultation, Mr. Foley "stated that he does wear protection at work." Ex. I to Defs.' Mot. for Summ. J. at 2, ECF No. 107-15 (Dec. 3, 2021). He further noted that Mr. Foley "wears ear protection all of the time [and] only when he is snowplowing does []he not wear ear protection as this appears to interfere with his abilities for plowing as well as for safety purposes." *Id.* at 2. Because only snowplowing seemed to bother him at work, Dr. Sawyer suggested that "it would not be inappropriate to consider having patient work in other areas other than plowing during the winter. All other activities do not appear to be an issue for patient." *Id.* at 3. According to the letter, Mr. Foley told Dr. Sawyer that he had taken time off of work

"because of his difficulty with flaring up of his ringing"—including six days in November 2016, three days in December 2016, three days in January 2017, one day in February 2017, two days in March 2017, two days in April 2017, and five days in July 2017—but that these days were "not preceded by noise exposure at work but sometimes because of stress at work as well as difficulty with sleeping." *Id.* at 2. The letter also noted that Mr. Foley's "hearing loss appears to be improved" and that "since Mr. Foley is provided with OSHA approved ear protection while at work there is no reason why patient's increased symptoms of hearing loss and ringing are substantiated." *Id.* at 3.

Also on August 15, 2017, Dr. Sawyer completed another Certification Form. Ex. YY to Defs.' Mot. for Summ. J. at 2, ECF No. 107-57 (Dec. 3, 2021). This form stated that Mr. Foley "needs ear protection to avoid noise trauma," and that he also suffers from "sleep deprivation" and "stress." *Id.* at 3. It indicated, too, that Mr. Foley will not "need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of [his] medical condition," but that the condition will "cause episodic flare-ups periodically preventing [him] from performing his[] job functions." *Id.* at 4. During these flare-ups, the form indicated, it would be "medically necessary for [Mr. Foley] to be absent from work" when he "cannot concentrate [at] work." *Id.*

On August 25, 2017, Ms. Traversa wrote a letter to Mr. Foley stating that the Town of Marlborough required more information about the types of functions Mr. Foley could not perform when he has a flare-up, because Dr. Sawyer's August 15, 2017 Certification Form does not "opine[] on what functions of [Mr. Foley's] position that [he is] unable to perform (other than possible plowing in winter months)." Ex. J to Defs.' Mot. for Summ. J. at 2–3, ECF No. 107-16 (Dec. 3, 2021). The letter noted that "[a] sufficient medical certification must specify

what functions of the employee's position the employee is unable to perform so that the employer can then determine whether the employee is unable to perform one or more essential functions of the employee's position." *Id.* at 2. The letter also noted that Mr. Foley is provided with ear protection. *Id.* at 2.

Also on August 25, 2017, Ms. Traversa wrote to Dr. Sawyer stating that the FMLA Certification Form he completed for Mr. Foley did "not provide enough specificity to allow the Town [of Marlborough] to make a determination on how to proceed with Mr. Foley's request for leave under the FMLA." Ex. K to Defs.' Mot. for Summ. J. at 2, ECF No. 107-17 (Dec. 3, 2021). The letter sought clarification on whether Dr. Sawyer concludes that Mr. Foley's stress and sleep deprivation are chronic serious health conditions as defined in federal regulations. *Id*. The letter also requested that Dr. Sawyer specify the job functions that Mr. Foley would be unable to perform, the frequency and duration of his inability to perform these functions, and whether there are any medically necessary work restrictions. *Id*. at 2–3.

On August 28, 2017, Dr. Sawyer clarified that stress and sleep deprivation "are significant medical problems but [that he] would not classify these as serious health conditions." Ex. L to Defs.' Mot. for Summ. J. at 2, ECF No. 107-18 (Dec. 3, 2021) ("Ex. L"). Dr. Sawyer's letter also reiterated that Mr. Foley "does wear ear protection with the exception of when he snowplows . . . therefore the only job that he is unable to perform is plowing snow. Otherwise he can perform all job duties and he is aware that in certain aspects of the job he will need to continue to wear ear protection which would not preclude him from working at that job." *Id*. Mr. Foley would not require any immediate follow-up, but Dr. Sawyer flagged that Mr. Foley may need to follow up with his primary care physician regarding the stress and sleep deprivation, and is unable to perform any duties when he has a flare-up. *Id*.

On August 30, 2017, Ms. Traversa wrote to Mr. Foley denying his FMLA request for leave, "since the answers set forth in the FMLA Certification Form do not meet the eligibility requirements for leave under the FMLA." Ex. M to Defs.' Mot. for Summ. J. at 2, ECF No. 107-19 (Dec. 3, 2021). Ms. Traversa's letter noted that Dr. Sawyer did not believe Mr. Foley's stress and sleep deprivation are serious health conditions as defined under the FMLA. *Id.* Regarding the flare-ups, Ms. Traversa's letter noted that Dr. Sawyer's statement that Mr. Foley cannot perform any duties during a flareup "is restating what [Mr. Foley] told him, not a medical opinion," and, therefore, "Dr. Sawyer has not provided specificity or a medical opinion on the issue" and also did "not provide any specificity regarding the 'frequency and duration 'of [Mr. Foley's] inability to perform the functions of [his] job." *Id.*; *see also* Pl.'s 56(a)(2) Statement ¶ 17 (admitting that "Plaintiff being unable to perform any job functions when he had a flare up were Plaintiff's words"). The letter concluded that a request for leave due to tinnitus is not supported by the Certification Form and that unless Mr. Foley has sick time available or can request other paid time off, he is expected to report to work. *Id.*

In the evening of February 26, 2018, Mr. Foley sent an e-mail to Ms. Traversa requesting leave under the FMLA "for the foregoing twelve month[s] in order to care for [his] [m]other due to a serious health condition." Ex. N to Defs.' Mot. for Summ. J. at 2, ECF No. 107-20 (Dec. 3, 2021).

On March 2, 2018, Mr. Foley completed a Certification Form for FMLA leave due to having to care for his mother, who had cancer. Ex. O to Defs.' Mot. for Summ. J., ECF No. 107-21 (Dec. 3, 2021). The form, which is signed by oncologist Todd Alekshun, noted that Mr. Foley's mother required chemotherapy treatment and therefore needed transportation assistance,

side effect management, and assistance. *Id*. at 3–4. Dr. Alekshun estimated that Mr. Foley's mother would require care 4-8 hours per day, 3-4 days per week, for an indefinite period. *Id*. at 4.

On March 7, 2018, Ms. Traversa sent Mr. Foley an e-mail requesting additional information about his request for FMLA leave, including specificity regarding the intermittent leave Mr. Foley needed to take and details regarding potential flare-ups. Ex. P to Defs.' Mot. for Summ. J., ECF No. 107-22 (Dec. 3, 2021).

On March 12, 2018, Mr. Foley explained, through an e-mail, that Dr. Alekshun had provided estimates of the amount of time that could be needed if Mr. Foley's mother experienced side effects. *Id.* at 3–4.

On March 16, 2018, Ms. Traversa approved Mr. Foley's FMLA request, with the understanding that he did not currently require time off but that he would let his supervisors know in advance when he did require time off to care for his mother. *Id.* at 2.

On April 16, 2018, Ms. Traversa sent Mr. Foley an e-mail advising him that he was expected under the FMLA to provide his supervisors thirty days' notice regarding foreseeable intermittent leave, and as much notice as possible for any unforeseeable leave. Defs.' 56(a)(2) Statement ¶ 31; Ex. 16 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 27, ECF No. 110-18 (Dec. 6, 2021) ("Ex. 16")). The e-mail noted that Mr. Foley's notice on April 12, 2018, "appears to have been untimely" and asked that "[i]n the future and as previously requested," he "provide notice of medical appointments either with 30 days' notice or, if the appointment is made less than 30 days ahead of time, on the day that the appointment is made." *Id.* at 2. Ms. Traversa asked that Mr. Foley provide his supervisor with all foreseeable medical appointments for the next several weeks. Defs.' 56(a)(2) Statement

¶ 32; Ex. 16 at 2. The e-mail also noted that Mr. Foley needed to provide his supervisor "with the specific reason for taking leave each time, to ensure the reason is FMLA qualifying." *Id.*

On April 23, 2018, Mr. Foley sent Ms. Traversa an e-mail indicating that he had followed up with a primary care physician concerning his previous FMLA requests, and asked how he could proceed. Ex. BBB to Defs.' Mot. for Summ. J. at 3, ECF No. 107-60 (Dec. 3, 2021). On April 24, 2018, Ms. Traversa replied, noting that Mr. Foley's previous FMLA requests had been either denied or approved, and therefore he would have to initiate a new request for leave under the FMLA, and that he would need to submit a Certification Form regarding that request. *Id.* at 3. Mr. Foley replied that same day, noting that Dr. Sawyer had recommended he see a primary care physician concerning his "difficulties with tinnitus" and that he would be providing them with the paperwork. *Id.* at 2. On April 25, 2018, Ms. Traversa sent Mr. Foley a WH-380-E form through an e-mail. *Id.* at 3.

On May 3, 2018, Ms. Traversa informed Mr. Foley that he had taken excess time off through April 23, 2018, but that he would not be penalized because of inaccurate information provided by his supervisor. Defs.' 56(a)(1) Statement ¶ 20; Ex. Q to Defs.' Mot. for Summ. J. at 2, ECF No. 107-23 (Dec. 3, 2021). Ms. Traversa also informed Mr. Foley that he had exhausted all paid leave aside from ten hours of sick time that he would be allotted each month. *Id.* She flagged that the only leave he could take were the ten hours of sick leave and the unpaid FMLA leave, and any time not covered by either of these categories would "be deemed an unexcused absence and will be subject to disciplinary action up to and including termination of [his] employment." *Id.*

The parties disagree as to the time that Mr. Foley took off under the FMLA. Defendants claim that Mr. Foley took time off on March 23, 2018; March 29, 2018; April 6, 2018; April 10,

2018; April 12, 2018; April 17, 2018; April 30, 2018; and May 3, 2018. Defs.' 56(a)(1)

Statement ¶ 19. Mr. Foley denies that he used FMLA leave time on March 23, 2018; March 29,

2018; April 10, 2018; April 17, 2018; or May 3, 2018. Pl.'s 56(a)(2) Statement ¶ 19. Defendants

also claim that Mr. Foley took time off on May 4, 2018; May 7, 2018; and May 10, 2018, and

that the total time used for his mother was 62.25 hours. Defs.' 56(a)(1) Statement ¶ 21. Mr.

Foley admits only to taking time on May 4, 2018 and May 10, 2018, and denies having used

62.25 hours to take care of his mother. Pl.'s 56(a)(2) Statement ¶ 21.

 Mr. Foley took five days of funeral leave after his mother passed on May 11, 2018.

Defs.' 56(a)(1) Statement ¶ 22; Pl.'s 56(a)(2) Statement ¶ 22. The parties disagree on whether

Mr. Foley's union contract allowed for three days of funeral leave or five days. *Id*.

 On June 13, 2018, Mr. Foley sent another e-mail to Ms. Traversa stating that he had seen

his primary physician concerning his tinnitus, and that he had been prescribed medication "to use

as needed when [he has] issues with tinnitus." Ex. S to Defs.' Mot. for Summ. J. at 4, ECF No.

107-25 (Dec. 3, 2021) ("Ex. S"). He noted having been unable to attend work on Tuesday, June

12, 2018, because he had used the medication overnight on Monday, June 11, 2018. *Id*. He

claimed to have been unable to work "due to the contract restrictions for controlled substances."

*Id*. Mr. Foley asked that "this be covered under the worker[']s comp continues pay benefit since

it is a work related injury," and that Ms. Traversa "consider approving [his] request for leave

under FMLA now that [he was] being treated and will continue with follow up appointments."

*Id*. Ms. Traversa replied on June 15, 2018, stating that she had contacted the Town of

Marlborough's worker's compensation carrier and was told that his claim for tinnitus "has been,

and still remains, denied," and therefore he is ineligible for the continuation benefit. *Id*. at 3. Her

e-mail also notes that he did not have any outstanding requests for leave under the FMLA,

because all previous requests had been addressed, and that if he was seeking a new request he should submit a Certification Form, which she attached to her e-mail. *Id.*

On August 6, 2018 and August 7, 2018, Mr. Foley "advised his supervisor that he needed to take time off from work related to his tinnitus." Defs.' 56(a)(2) Statement ¶ 35.

On August 14, 2018, Mr. Foley replied to Ms. Traversa's June 15, 2018 e-mail. Ex. S at 3. The e-mail stated that he requested a hearing with the worker's comp commissioners to decide whether his tinnitus should be covered. He again also noted that he "ha[d] not yet received a[n] approval for [his] FMLA request," and claimed that he "now met [his] obligations under the FMLA [guidelines] to receive leave" because his primary care physician had prescribed medication to help with his tinnitus and loss of sleep. *Id.* Mr. Foley followed up with an e-mail on Sunday, August 19, 2018, stating that it had been almost one week since he had reached out and asking whether there was "a reason why [she] ha[d] not responded to [his] request." *Id.* at 2. On Monday, August 20, 2018, Ms. Traversa again replied that she is unaware of an outstanding request for leave under the FMLA, noted that she had indicated on June 15 and June 19 that he should submit a Certification Form if he wished to request leave again, and again attached the Certification Form and a copy of his job description, for his treating physician to complete. *Id.*

On August 20, 2018, Ms. Traversa sent an e-mail to Mr. Foley's union representative alerting him that Mr. Foley was absent from work on August 7, 2018, due to tinnitus but that he only had 4.75 hours of sick time left as of that date, which was insufficient to cover his 8-hour shift. Defs.' 56(a)(2) Statement ¶ 38; Ex. 20 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-21 (Dec. 6, 2021). According to the e-mail, on August 14, 2018, Mr. Foley submitted a time off request form that claimed he was using a vacation day for the August 7, 2018 absence. *Id.* at 2. Ms. Traversa's e-

mail noted that "[i]n accordance with Article 11 of the Teamsters contract, [she was] providing [the union representative] with notice that [she was] currently investigating whether discipline is warranted for Mr. Foley's conduct with respect to the timeliness of his notice and whether the vacation day was approved by Mr. Foley's supervisor, as required by the Teamsters contract." *Id.*

On August 22, 2018, Mr. Foley submitted a Certification Form completed by Dr. Tatyana Divino. Ex. U to Defs.' Mot. for Summ. J. at 5, ECF No. 107-27 (Dec. 3, 2021) ("Ex. U"). The form, which indicated that Dr. Divino had treated Mr. Foley on September 18, 2017; March 3, 2018; and August 22, 2018, stated that he could not use heavy equipment on days when he suffered severe sleep loss, due to the risks of a work accident. Defs.' 56(a)(1) Statement ¶ 27; Ex. T to Defs.' Mot. for Summ. J. at 3, ECF No. 107-26 (Dec. 3, 2021). The form stated that Mr. Foley would not be incapacitated for a single continuous period of time due to his medical condition, that treatments or reduced number of hours are not medically necessary, that he would need to attend one follow-up treatment appointment every three months, and that it is medically necessary for him to avoid work during flare-ups, which could happen two times per week. *Id.* at 4.

On August 28, 2018, Mr. Foley followed up with Ms. Taversa on his FMLA application. Ex. U at 5. On August 30, 2018, Ms. Taversa sent Mr. Foley an e-mail requesting clarification on the treatment and visits that would be required. *Id.* at 4. She also requested to contact the health care provider "to obtain clarification regarding the certification" because their "statement that follow-up treatment appointments are not medically necessary contradicts the other answers in the certification." *Id.* Ms. Taversa attached a copy of a HIPAA authorization form for Mr. Foley to complete, so that she could speak to the health care provider. That same day, Mr. Foley

replied stating "[a]s you are aware, [I] am in need of FMLA as we speak," and that he would be providing his physician the forms and a copy of Ms. Taversa's email. *Id.*

On September 3, 2018, Ms. Traversa sent Mr. Foley an e-mail indicating that she also needed clarification on what Dr. Divino meant by "heavy equipment." Ms. Taversa warned Mr. Foley that if he did not return the HIPAA authorization and did not authorize her to clarify certification with the physician, she would "have no choice but to further delay or deny [his] request for FMLA leave." Ex. U at 3. That same day, Mr. Foley replied, requesting all the clarifications needed. He also noted that his "first request for leave was only denied due to the fact that [his] follow up appointments were not with Dr. Sawyer," and claimed that now that his "follow ups [are] with [his] primary physician for the same condition, [his] request for leave should have been approved." *Id.*

On September 4, 2018, Ms. Traversa sent Mr. Foley an e-mail clarifying that his earlier FMLA request "was not denied only because any 'follow up appointments were not with Dr. Sawyer,'" but because Dr. Sawyer said follow-ups were not necessary and that Mr. Foley's sleep deprivation and stress were not serious health conditions. *Id.* at 2. Ms. Taversa then outlined the additional information and clarification she claimed to need, concerning whether treatment visits are needed at least twice per year, how many treatment visits are routine examinations, and which job functions Mr. Foley would be unable to perform. Defs.' 56(a)(1) Statement ¶ 27; Ex. U at 2. The e-mail noted that Mr. Foley's job description did not use the term "heavy equipment." Ex. U at 2. Ms. Taversa requested a response within seven calendar days and also provided Mr. Foley with a HIPAA authorization form so that she could contact Dr. Divino to discuss the certification, "[t]o avoid any further delay." *Id.* at 2–3.

On September 5, 2018, Mr. Foley sent Ms. Traversa an e-mail arguing that Dr. Sawyer's letter simply opined that Mr. Foley's condition was not a serious health condition, but that he was not referencing the FMLA and that his opinion "is not what qualifies or disqualifies leave under [the] FMLA." Ex. V to Defs.' Mot. for Summ. J. at 4, ECF No. 107-28 (Dec. 3, 2021). Mr. Foley's e-mail also stated that he did not believe Ms. Taversa had to speak with his physician, and that he would be following up with the questions that he thought might be relevant. *Id*. The e-mail ended with Mr. Foley stating that Ms. Taversa had not replied to his request for leave within the required five days. *Id*. at 5.

On September 6, 2018, Ms. Traversa sent Mr. Foley a letter notifying him that the Town of Marlborough "was considering disciplinary action against [him] as a result of [his] unexcused absences on August 7, 2018 (3.25 hours) and August 13, 2018 (1.75 hours)." Ex. 29 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-24 (Dec. 6, 2021). The letter further noted that Ms. Traversa "ha[d] initiated an investigation into [his] unexcused absence of 8 hours on August 30, 2018 and [his] unexcused and unauthorized absence of 8 hours on August 31, 2018." *Id*. Mr. Traversa was informed of a pre-determination hearing to be held on September 10, 2018 at 2 p.m. and of his rights for the hearing. *Id*. The letter also notes that his previous three-day suspension from September 2018 would be considered by the Town of Marlborough in determining the discipline to be imposed. *Id*.

The parties disagree on whether Defendants were on notice that Mr. Foley's absences on August 6, 7, 30, and 31 were reported by Mr. Foley to be related to his tinnitus.

Mr. Foley claims that they were on notice. Pl.'s 56(a)(1) Statement ¶ 44 (citing Ex. 17 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs.

at 2–5, ECF No. 110-19 (Dec. 6, 2021) (text messages from Mr. Foley to his supervisor on

August 6 and 7; a time off request sheet for August 13, 2018 that was filled out that same day

and disapproved; a time off request sheet for August 7 and 8 that was filled out on August 14,

2018 and disapproved that same day); Ex. 31 to Pl.'s Local R. 56(a)(1) Statement of Undisputed

Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-25 (Dec. 6, 2021) (notes

dated "9/10/2018" which state that Mr. Foley "texted out 'due to tinnitus'" on both August 30

and 31, and that for each of these dates he "submitted a request upon his return on September 4th

noting: FMLA/Worker's Comp." and that both were denied by his supervisor)).

Defendants argue that the Town of Marlborough was on notice that the August 6 and 7

dates were claimed to be related to tinnitus because Mr. Foley sent a text to his supervisor on

those dates, but that there is "no showing as to when or if this was communicated to [Ms.]

Traversa." Defs.' 56(a)(2) Statement ¶ 44. Defendants also note that "there is no showing as to . .

. when exhibit 31 was created" and note that "[i]t is dated September 10, 2018 but includes

notations about September 11, 2018." *Id.*

On September 7, 2018, Mr. Foley provided Ms. Taversa, through an e-mail, a revised

certification form completed by Dr. Divino. Pl.'s 56(a)(2) Statement ¶ 28; Ex. W to Defs.' Mot.

for Summ. J., ECF No. 107-29 (Dec. 3, 2021) ("Ex. W"). His e-mail also noted that his physician

advised him to answer that it would not be necessary for him to take FMLA leave for follow-up

appointments. Ex. W at 2.

On September 9, 2018, Mr. Foley "submitted an additional completed medical

certification from his physician to Defendants." Pl.'s 56(a)(1) Statement ¶ 45 (citing Ex. 34 to

Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs.

at 2, ECF No. 110-27 (Dec. 6, 2021) ("Ex. 34"). Defendants admit that Exhibit 34 was submitted, but deny that it was completed. Defs.' 56(a)(2) Statement ¶ 45.

On September 10, 2018, Ms. Traversa sent Mr. Foley a letter stating that he was being suspended, without pay, for four days, to be served on September 10–21, 2018, because of unauthorized absences on August 7, 2015 and August 13, 2018. Ex. RR to Defs.' Mot. for Summ. J. at 2, ECF No. 107-50 (Dec. 3, 2021). The letter also noted that Mr. Foley had previously been disciplined for similar conduct in September 2017, and that "any future unexcused and/or unauthorized absences may result in further disciplinary action, up to and including termination of [his] employment." *Id.* This suspension was held in abeyance while the United States Department of Labor investigated Mr. Foley's federal FMLA claim. Pl.'s 56(a)(2) Statement ¶ 25. The suspension was never enforced, though Mr. Foley alleges that it was not enforced because the Town of Marlborough was informed by the United States Department of Labor ("DOL") that it was in violation of the FMLA. Defs.' 56(a)(1) Statement ¶ 25; Pl.'s 56(a)(2) Statement ¶ 25.

On September 11, 2018, at 10:24 a.m., Mr. Foley sent an e-mail to Ms. Traversa stating that she "continue[s] to delay [his] request for leave under FMLA," and that it had been five days since she received his new Certification Forms and "yet [he] ha[d] not received any communication," and that she "ha[d] not followed the time lines under FMLA for responding during this whole process." Ex. 34 at 2. That same day, at 11:50 a.m, Ms. Traversa replied stating that Mr. Foley had "emailed pictures of the previously submitted certification form on Friday, September 9, 2018." *Id.* She further noted that September 11, 2018 was "the fourth calendar day since Friday," and that "the Town Hall closes at noon on Fridays, making this only the second business day." *Id.* The e-mail stated that the Town of Marlborough had "not received

an original copy of either the original certification form or the revised version, as requested." *Id.*
She concluded that she would "notify [him] in a timely manner once a decision is made or if
additional information is required to make a determination." *Id.*

Also on September 11, 2018, Mr. Foley filed a complaint with the DOL, alleging
violation of his rights under the FMLA. Pl.'s 56(a)(1) Statement ¶ 49.

On September 12, 2018, Ms. Taversa sent Mr. Foley an e-mail indicating that his request
for leave would be provisionally approved. Pl.'s 56(a)(2) Statement ¶ 28; Ex. X to Defs.' Mot.
for Summ. J., ECF No. 107-30 (Dec. 3, 2021) ("Ex. X"). The e-mail noted that the leave was
provisionally approved because the Town was "exercising its right to obtain a second medical
opinion regarding [Mr. Foley's] condition at its own expense." Ex. X at 2. Ms. Taversa explained
that his request for FMLA leave

> is provisionally approved as of August 22, 2018, and therefore,
> absences for which you provided appropriate notice of the need for
> leave regarding your tinnitus on or after August 22, 2018 will be
> treated as provisionally-approved FMLA leave. As also described
> above, you will first be required to use any available paid sick,
> vacation, or personal leave concurrent with FMLA leave taken on
> or after tomorrow, September 13, 2018.

*Id.* at 3 (emphasis omitted). The e-mail also noted that Mr. Foley would have to notify his
supervisors of FMLA leave following "the notice requirements for the use of sick leave set forth
in the Teamsters Union contract," and that he must identify tinnitus as the reason for such leave
for it to be properly identified as FMLA leave. *Id.* at 2.

On October 16, 2018, Mr. Foley notified his supervisor that he would arrive late to work
that day because of FMLA. Defs.' 56(a)(2) Statement ¶ 51; Ex. Y to Pl.'s Local R. 56(a)(1)
Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-39

(Dec. 6, 2021). His supervisor replied that he could not "use FMLA to come in late," so he would need to use FMLA time to take off the full day. *Id.* at 2.

Mr. Foley sent Ms. Wagner requests for a tally of his FMLA time on three different dates: December 5, 2018; December 11, 2018; and January 23, 2019. Pl.'s 56(a)(1) Statement ¶¶ 52, 54, 57 (citing Ex. 38 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-29 (Dec. 6, 2021); Ex. 39 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-30 (Dec. 6, 2021); Ex. CC to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 2, ECF No. 110-40 (Dec. 6, 2021) ("Ex. CC")). On December 11, 2018, Ms. Wagner forwarded the request received that same day to Ms. Traversa, inquiring how she wanted Ms. Wagner to respond. Ms. Wagner's e-mail noted that she knew they were "trying to decide whether to track his time by calendar year, fiscal year or from the first FMLA instance." Ex. 46 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 3, ECF No. 110-34 (Dec. 6, 2021). Defendants claim that DOL Investigator Cris Moses "suggested [the Town of] Marlborough change the method it used from the rolling backward method to one of the three methods stated in Wagner's email based on Moses's personal opinion as to which measurement method was easiest to administer." Defs.' 56(a)(2) Statement ¶ 56 (citing Ex. OOO to Defs.' Local R. 56(a)(2) Statement of Facts in Opp'n to Summ. J. for Pl. at 56:25–57:24, ECF No. 119-72 (Jan. 21, 2022) (deposition of Ms. Wagner) ("Ex. OOO"); Aff. of Amy Traversa ¶ 10.b, ECF No. 119-2 (Jan. 21, 2022) ("Traversa Aff."); Aff. of Hayley Wagner ¶ 10, ECF No. 119-3 (Jan. 21, 2022)). Defendants also recognize that the Town of Marlborough declined to adopt his suggestion. *Id.*

Mr. Foley did not receive a response to his requests until January 24, 2019, when Ms. Wagner told him that "[s]ince pay period ending 4/7/18 through pay period ending 1/12/19 [he had] used 395.7 hours of FMLA." Ex. CC at 2. Ms. Wagner also informed Mr. Foley that "from 4/8/18 through pay period ending 1/26/19" he had "'actually worked' 941.00 hours." *Id*. Mr. Foley, however, was "informed as of May 3, 2018[] that it was the responsibility of each employee to track available time off and that pursuant to [the Town of] Marlborough's Personnel Rules FMLA leave was available to employees who had used less than 12 weeks of leave during any 12-month period." Defs.' 56(a)(2) Statement ¶ 70. The DOL investigator also "concluded that '[the Town of Marlborough] and [Mr. Foley] presented various forms of communication that proved that [Mr. Foley] was aware of the time used and still remaining by [Mr. Foley's] supervisor, [Ms. Wagner,] and [Ms. Traversa.]'" *Id.* ¶¶ 60, 70 (quoting Ex. B to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 5, ECF No. 110-1 (Dec. 6, 2021) ("DOL FMLA Report") (Family Medical Leave Act Narrative Report dated June 11, 2019)). The parties disagree as to the correct calculation of FMLA leave time that Mr. Foley took while employed by the Town of Marlborough. Pl.'s 56(a)(2) Statement ¶¶ 35, 36.

On February 13, 2019, Ms. Traversa sent Mr. Foley a letter informing him that he had exhausted his FMLA hours and continued absences could lead to discipline, including termination of employment. Pl.'s 56(a)(2) Statement ¶ 37.

On March 4, 2019, Ms. Traversa sent Mr. Foley a letter informing him that the Town of Marlborough was considering disciplinary action against him due to unexcused absences since February 13, 2019. Ex. CCC to Defs.' Local R. 56(a)(2) Statement of Facts in Opp'n to Summ. J. for Pl., ECF No. 119-60 (Jan. 21, 2022). Following the letter, Mr. Foley and Defendants engaged

in correspondence disputing the allegations and stating reasons why he believed he should be permitted to continue taking leave. Defs.' 56(a)(2) Statement ¶¶ 72, 73.

On March 8, 2019, Ms. Traversa sent Mr. Foley a termination letter which stated that he had exceeded all available time off under the FMLA and continued to take time off despite being told that he had no paid or unpaid leave available. Pl.'s 56(a)(2) Statement ¶ 47.

On June 11, 2019, the DOL issued a report of its investigation into Mr. Foley's September 11, 2018 complaint. The report found technical violations of FMLA regulations. Defs.' 56(a)(2) Statement ¶ 76.

The Personnel Rules and Regulation in effect during Mr. Foley's employment provided that an employee otherwise eligible for FMLA leave was entitled to "'12 weeks of unpaid leave within any 12 month period.'" Defs.' 56(a)(2) Statement ¶ 9 (quoting Ex. 2 to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. at 27, ECF No. 110-9 (Dec. 6, 2021)). Defendants note that "any 12 month period" is a phrase used numerous times in the Code of Federal Regulations. Defs.' 56(a)(2) Statement ¶ 14. The parties agree that "[i]nformational posters displayed by the Town [of Marlborough] to employees did not make any reference to which method of calculating employee FMLA leave use the Town used." Defs.' 56(a)(2) Statement ¶ 15.

The parties disagree as to Mr. Foley's knowledge of the Town of Marlborough's method for calculating FMLA time and how FMLA leave generally worked. Mr. Foley claims that Defendants did not advise him before 2019 that they intended to use the "rolling" method for calculating FMLA use, Pl.'s 56(a)(1) Statement ¶ 59 (citing Ex. A to Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs. ¶ 15, ECF No. 110-1 (Dec. 6, 2021) ("Foley Aff.") (declaration of James Foley)); that when requesting leave in 2018

for his own condition he did not know how the FMLA leave allotments worked, Pl.'s 56(a)(1)

Statement ¶ 60; that he did not learn until February 2019 that FMLA use for his own condition

and his mother's care were counted against a single 12-week allotment, Pl.'s 56(a)(1) Statement

¶ 61; that as of January 2019 he did not know which 12 month period the Town of Marlborough

was using to calculate his FMLA use, Pl.'s 56(a)(1) Statement ¶ 62; and that the first time he was

informed that the rolling method would be used to calculate his FMLA use was February 13,

2019, Pl.'s 56(a)(1) Statement ¶¶ 63, 64.

  Defendants disagree with these claims, and note that the DOL investigator's report

concluded that "'there was credible information that came from [Mr. Foley] and [the Town of

Marlborough] that [Mr. Foley] knew at the very least that [the Town of Marlborough] used either

'rolling forward' (as verbally expressed from [Mr. Foley] and 1st Selectman) or 'backward' (as

the Attorney indicated in a written response after initial contact with [Mr. Foley] and/or 1st

Selectman).'" Defs.' 56(a)(2) Statement ¶ 59 (quoting DOL FMLA Report at 6). Defendants

further note that the DOL investigator "concluded that '[the Town of Marlborough] and [Mr.

Foley] presented various forms of communication that proved that [Mr. Foley] was aware of the

time used and still remaining by [Mr. Foley's] supervisor, [Ms. Wagner,] and [Ms. Traversa].'"

Defs.' 56(a)(2) Statement ¶ 60 (quoting DOL FMLA Report at 5).

  The parties also disagree on whether Mr. Foley would have adjusted his decisions had he

been informed earlier of the method used to calculate his FMLA use "and/or that his FMLA use

for both his serious health condition and his mother's serious health condition were counted

against the same 12-week allotment." Pl.'s 56(a)(1) Statement ¶¶ 65–67. Specifically, Mr. Foley

claims he would have adjusted his use of prescription sleep medication in order to use less

FMLA leave time, *id.* ¶ 65; modified his evening family and childcare obligations, *id.* ¶ 66; and

used less FMLA leave time to care for his mother because other family members could have

assisted, *id*. ¶ 67. Defendants deny this, noting that Mr. Foley did not alter his behavior "after

notification of his time used on January 21, 2019, or when he was told he had exhausted his

FMLA leave entitlement on February 13, 2019, nor did he state that he could do so when [Ms.]

Traversa twice offered to discuss accommodations." Defs.' 56(a)(2) Statement ¶ 65. Defendants

also note that Mr. Foley "stated [that] he believed the fiscal year method would be used, or that

his time would be measured from August 22, 2018," which contradicts his testimony that he

would have acted differently had he known that he would not "replenish [his FMLA leave] on

the first of the year." *Id*. (citing Ex. FF to Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 2,

ECF No. 119-37 (Jan. 21, 2022) (February 14, 2019 e-mail from Mr. Foley to Ms. Traversa

stating that Mr. Foley had been advised by DOL that this FMLA would run from July 1 to June

30)).

The parties disagree as to whether Mr. Foley was provided a completed Designation

Notice (form WH-382) or an equivalent notice, Pl.'s 56(a)(1) Statement ¶ 68 (citing Foley Aff. ¶

11), which Defendants deny, Defs.' 56(a)(2) Statement ¶ 68. Mr. Foley also claims that he was

not provided a Notice of Eligibility and Rights & Responsibility (form WH-381) or other written

notice with the information required by 29 C.F.R. § 825.300(b), Pl.'s 56(a)(1) Statement ¶ 69

(citing Foley Aff. ¶ 12), which Defendants also deny, Defs.' 56(a)(2) Statement ¶ 69.

###    B.    Procedural History

On September 20, 2019, Plaintiff filed his initial Complaint. Compl., ECF No. 1 (Sept.

20, 2019).

On December 18, 2019, Ms. Traversa filed a motion to dismiss. Mot. to Dismiss, ECF

No. 27 (Dec. 18, 2019).

On December 18, 2019, the Town of Marlborough filed its Answer. Answer, ECF No. 28 (Dec. 18, 2019).

On March 9, 2020, Plaintiff filed his Amended Complaint. Am. Compl., ECF No. 36 (Mar. 9, 2020).

On March 30, 2020, Ms. Traversa, filed her Answer to the Amended Complaint. Answer, ECF No. 39 (Mar. 30, 2020).

On June 30, 2020, the Court denied Ms. Traversa's motion to dismiss as moot in light of the filing of the Amended Complaint, to which Defendants consented. Order, ECF No. 46 (June 30, 2020).

On January 25, 2021, the Town of Marlborough filed an Amended Answer to the Amended Complaint. Am. Answer, ECF No. 66 (Jan. 25, 2021).

On March 3, 2021, the Town of Marlborough filed a second Amended Answer to the Amended Complaint. Am. Answer, ECF No. 67 (Mar. 3, 2021).

On March 3, 2021, Ms. Traversa filed an Amended Answer to the Amended Complaint. Am. Answer, ECF No. 68 (Mar. 3, 2021).

On October 1, 2021, the Town of Marlborough filed its motion to compel Indeed. Mot. to Compel, ECF No. 95 (Oct. 1, 2021) ("Mot. to Compel"); Mem. of Law in Supp. of Mot. to Compel, ECF No. 95-1 (Oct. 1, 2021) ("Mot. to Compel Mem.").

On October 27, 2021, Indeed filed its opposition to the Town of Marlborough's motion to compel. Non-Party Indeed, Inc.'s Opp'n to Def. Town of Marlborough's Mot. to Compel, ECF No. 101 (Oct. 27, 2021) ("Opp'n to Mot. to Compel").

On November 10, 2021, the Town of Marlborough filed its reply to Indeed's opposition to the motion to compel. Reply Mem. of Law in Further Supp. of Mot. to Compel, ECF No. 103 (Nov. 10, 2021) ("Reply to Opp'n to Mot. Compel").

On November 22, 2021, the Court held a motion hearing concerning the motion to compel. At the status conference, the Court ordered the parties to provide a status report regarding the disputed subpoena by December 10, 2021. Min. Entry, ECF No. 106 (Nov. 22, 2021).

On December 3, 2021, Defendants filed a joint motion for summary judgment. Defs.' Mot. for Summ. J., ECF No. 107 (Dec. 3, 2021) ("Defs.' Mot. for Summ. J."); Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 107-2 (Dec. 3, 2021) ("Defs.' Mem. in Supp. of Mot. for Summ. J."). Along with their motion for summary judgment, Defendants filed their statement of undisputed facts in support of motion for summary judgment. Defs.' Local R. 56(a)(1) Statement of Undisputed Fasts in Supp. of Mot. for Summ. J., ECF No. 107-1 (Dec. 3, 2021) ("Defs.' 56(a)(1) Statement").

On December 3, 2021, Mr. Foley filed a motion for partial summary judgment on Count One of the Amended Complaint. Pl.'s Mot. for Partial Summ. J., ECF No. 108 (Dec. 3, 2021) ("Pl.'s Mot. for Summ. J.").

On December 6, 2021, Mr. Foley filed a statement of undisputed facts supporting partial summary judgment against Defendants. Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs., ECF No. 110 (Dec. 6, 2021).

On December 7, 2021, Mr. Foley again filed his statement of undisputed facts.[2] Pl.'s Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs., ECF No. 111 (Dec. 7, 2021).

On December 10, 2021, the Town of Marlborough filed a status report, concerning its motion to compel, indicating that it had failed to resolve the discovery dispute with Indeed. Status Report, ECF No. 113 (Dec. 10, 2021).

On December 13, 2021, Mr. Foley filed a memorandum of law in support of his partial motion for summary judgment. Substituted Mem. of Law in Supp. of Pl.'s Partial Mot. for Summ. J., ECF No. 114 (Dec. 13, 2021) ("Pl.'s Mem. in Supp. of Mot. for Summ. J.").

On January 10, 2022, Mr. Foley filed an amended statement of facts. Pl.'s Am. Local R. 56(a)(1) Statement of Undisputed Facts Supporting Partial Summ. J. Against Defs., ECF No. 118 (Jan. 10, 2022) ("Pl.'s 56(a)(1) Statement").

On January 21, 2022, Defendants filed their memorandum in opposition to Mr. Foley's motion for summary judgment. Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 119 (Jan. 21, 2022) ("Defs.' Opp'n to Pl.'s Mot. for Summ. J.").

On the same day, Defendants filed their statement of facts in opposition to Mr. Foley's motion for summary judgment. Defs.' 56(a)(2) Statement.

Also on the same day, Mr. Foley filed a memorandum in opposition to Defendants' joint motion for summary judgment. Pl.'s Opp'n to Summ. J., ECF No. 120 (Jan. 21, 2022) ("Pl.'s Opp'n to Defs.' Mot. for Summ. J.").

Along with his opposition to summary judgment, Mr. Foley filed his statement of facts in opposition to Defendants' motion for summary judgment. Pl.'s 56(a)(2) Statement.

---

[2] This document was titled on ECF as a "Memorandum in Support" of the motion for summary judgment.

On February 4, 2022, Mr. Foley filed a reply to Defendants' opposition to his motion for partial summary judgment. Pl.'s Reply in Supp. of Summ. J. Against Defs., ECF No. 121 (Feb. 4, 2022) ("Pl.'s Reply").

On the same day, Defendants filed a reply to Mr. Foley's opposition to their motion for summary judgment. Defs.' Reply in Supp. of Mot. for Summ. J., ECF No. 122 (Feb. 4, 2022) ("Defs.' Reply").

On August 24, 2022, the Court held a hearing on the motions for summary judgment and the motion to compel. Min. Entry, ECF No. 124 (Aug. 24, 2022).

## II.    STANDARD OF REVIEW

### A.  Motion for Summary Judgment

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*. "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir.

2013) (internal citation omitted). If there is any evidence in the record from which a reasonable

factual inference could be drawn in favor of the non-moving party for the issue on which

summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford*

*v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

### B.  Motion to Compel

Rule 26(b)(1) of the Federal Rules of Civil Procedure, as amended on December 1, 2015,

recognizes that "[i]nformation is discoverable . . . if it is relevant to any party's claim or defense

and is proportional to the needs of the case." Fed. R. Civ. P. 26 advisory committee's note to

2015 amendment. Even after the 2015 amendments, "[r]elevance is still to be construed broadly

to encompass any matter that bears on, or that reasonably could lead to other matter that could

bear on any party's claim or defense." *Bagley v. Yale Univ.*, No. 3:13-cv-01890 (CSH), 2015 WL

8750901, at *7 (D. Conn. Dec. 14, 2015) (citing *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14

Civ. 9792, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)).

Moreover, the district court has "wide latitude to determine the scope of discovery." *In re*

*Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008); *Mirra v. Jordan*, No. 13-CV-

5519, 2016 WL 889683, at *2 (S.D.N.Y. Feb. 23, 2016) ("Motions to compel are left to the

court's sound discretion."). "The objecting party bears the burden of demonstrating specifically

how, despite the broad and liberal construction afforded [by] the federal discovery rules, each

request is not relevant or how each question is overly broad, unduly burdensome or

oppressive." *Klein v. AIG Trading Grp. Inc.*, 228 F.R.D. 418, 422 (D. Conn. 2005) (internal

citations and quotation marks omitted).

If a party fails to produce documents as requested under Rule 34 of the Federal Rules, the

party seeking discovery may move for an order compelling production. Fed. R. Civ. P. 37(a)(3).

31

Under Federal Rule 26(c)(1), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Where the discovery sought is relevant, the party seeking protection bears the burden of showing that good cause exists to grant the motion. *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir. 1981) (citations omitted); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (citation omitted). Rule 26(b)(1)'s relevance standard also governs a subpoena issued to a non-party under Rule 45. *Warnke v. CVS Corp.*, 265 F.R.D. 64, 66 (E.D.N.Y. 2010) (citing *During v. City Univ. of New York*, No. 05 CIV. 6992(RCC), 2006 WL 2192843, at *2 (S.D.N.Y. Aug. 1, 2006) (listing cases)).

## III.   DISCUSSION

Mr. Foley's Amended Complaint contains two claims: (1) interference with the exercise of rights in violation of the FMLA, 29 U.S.C. § 2601 *et seq*. and (2) retaliation in violation of the FMLA, 29 U.S.C. § 2612(a)(1) *et seq*. Am. Compl. Defendants move for summary judgment on both counts. Defs.' Mot. for Summ. J. Mr. Foley cross-moves for summary judgment on his interference claim. Pl.'s Mot. for Summ. J.

The Court will address each of these claims in turn.

Defendants also move to compel Indeed, a non-party, to provide documents requested in its subpoena and to provide an affidavit authenticating the documents.

The Court will also address this motion.

### A.  The Motions for Summary Judgment

The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). "The FMLA's central provision guarantees eligible

employees 12 weeks of leave in a 1-year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) (citing 29 U.S.C. § 2612(a)(1)). An eligible employee is one who has been employed with the same employer for at least twelve months and has accrued at least 1,250 hours of service with that employer. 29 U.S.C. § 2611(2)(a).

The FMLA further entitles the employee who takes leave "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). And it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the law. 29 U.S.C. § 2615(a)(1). The law "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (internal citation and quotation marks omitted).

There are two types of FMLA claims. Interference claims involve when an employer "has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). Retaliation claims are raised when an employee exercises her rights or opposes perceived FMLA violations and is then subjected to an adverse employment action. *Id.* (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004)). Mr. Foley raises both types of FMLA claims, which the Court will address in turn.

### 1. Interference with the Exercise of Rights in Violation of the FMLA

To establish a *prima facie* case of FMLA interference, a plaintiff must show: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). "[I]n an interference claim, the result must be that the employer denies the employee benefits under the FMLA." *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, 22 (D. Conn. 2018). "To bring a successful action under the FMLA, an employee must show . . . that the employee has been prejudiced by the violation." *Roberts v. Health Ass'n*, 308 F. App'x. 568, 569 (2d Cir. 2009) (summary order) (citing *Ragsdale*, 535 U.S. 81).

The parties appear to agree that Mr. Foley was an eligible employee, that the Town of Marlborough is an employer as defined by the FMLA, and that Ms. Traversa was responsible for making decisions regarding employees' FMLA requests. The question for summary judgment, then, is whether Mr. Foley has produced sufficient evidence to permit a reasonable jury to find that he was entitled to take leave under the FMLA, and that he was denied benefits to which he was entitled under the FMLA.

Defendants have moved for summary judgment, claiming that they did not interfere with Mr. Foley's exercise of his FMLA rights. Defs.' Mot. for Summ. J.; Defs.' Mem. in Supp. of Mot. for Summ. J. Mr. Foley has also moved for summary judgment on this claim. Pl.'s Mot. for Summ. J.; Pl.'s Mem. in Supp. of Mot. for Summ. J.

### a.   Notice of FMLA Eligibility and Calculation Method

Mr. Foley's interference claim relies in large part on Defendants' alleged failure to

provide him notice of his FMLA eligibility, rights, and the calculation method used to track his

leave.

The FMLA states that "an eligible employee shall be entitled to a total of 12 workweeks

of leave during any 12-month period for one or more" of five reasons which include: "[i]n order

to care for the . . . parent[] of the employee . . . if such . . . parent has a serious health condition"

and "[b]ecause of a serious health condition that makes the employee unable to perform the

functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)–(D). The U.S.

Department of Labor ("DOL") has set forth four "methods for determining the 12-month period

in which the 12 weeks of leave entitlement . . . occurs." 29 C.F.R. § 825.200(b). These four

methods include:

> (1) The calendar year;
> (2) Any fixed 12-month leave year, such as a fiscal year, a year
>     required by State law, or a year starting on an employee's
>     anniversary date;
> (3) The 12–month period measured forward from the date any
>     employee's first FMLA leave under paragraph (a) begins; or,
> (4) A 'rolling' 12–month period measured backward from the date
>     an employee uses any FMLA leave as described in paragraph
>     (a).

29 C.F.R. § 825.200(b)(1)–(4). The regulation further provides that employers may choose "any

one of the[se] alternatives . . . provided the alternative chosen is applied consistently and

uniformly to all employees." 29 C.F.R. § 825.200(d)(1). "If an employer fails to select one of the

options . . . of this section for measuring the 12-month period for the leave entitlements . . . the

option that provides the most beneficial outcome for the employee will be used." 29 C.F.R.

§ 825.200(e).

The regulation also requires that the employer provide certain notices when an employee requests FMLA leave. First, the employer must "notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b). Along with such notice, an employer is required to provide a rights and responsibilities notice, "detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.300(c)(1). "Such specific notice must include, as appropriate . . . [t]hat the leave may be designated and counted against the employee's annual FMLA leave entitlement if qualifying . . . and the applicable 12-month period for FMLA entitlement[.]" 29 C.F.R. § 825.300(c)(1)(i). Finally, the employer must provide, in writing and within five business days, a designation notice informing the employee "whether the leave will be designated and will be counted as FMLA leave." 29 C.F.R. § 825.300(d). The designation notice must be provided "[w]hen the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason (e.g., after receiving a certification)." *Id*. The regulation on employer notice requirements provides that "[f]ailure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300(e).

Defendants argue that Mr. Foley has no cause of action for not being notified of his FMLA eligibility, because "[t]he Second Circuit has declined to 'interpret the FMLA as giving an employee a right to sue the employer for failing to give notice of the terms of the Act where the lack of notice has no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act.'" Defs.' Mem. in Supp. of Mot. for Summ. J. at 30–31 (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999)).

Defendants also argue that Ms. Traversa and Ms. Wagner's testimony establishes "that [the Town of] Marlborough had always used [the rolling] method, having selected it when Darlene Crowley requested FMLA leave in July of 2017, and [the Town of] Marlborough informed the US DOL during its complaint investigation in November 2018 that [the Town of] Marlborough uses that measurement method." Defs.' Mem. in Supp. of Mot. for Summ. J. at 20. They claim that the "'Notice of Eligibility and Rights & Responsibilities' Form provided to Darlene Crowley in July 2017 contained a check mark next to the measured forward [calculation] method, [and Ms.] Wagner credibly testified that the designation was an error," *id*., and one "without consequence" because Ms. Crowley used her leave for only a three-month period, *id*. at 20 n.3.

According to Defendants, the January 24, 2019 e-mail to Mr. Foley, stating that he had used 395.75 hours of FMLA leave from the pay period ending April 7, 2018, to the pay period ending January 12, 2019, "demonstrated that both leave time in 2019 and 2018 was being counted toward his total FMLA leave entitlement (480 hours)" and that the FMLA time he used to care for his mother was also included. *Id*. at 21. Defendants note that this e-mail was sent "more than six weeks prior to his termination, and almost three weeks before he exhausted his 12-week FMLA leave entitlement." *Id*. at 21–22.

In any event, the evidence allegedly "shows that [Mr. Foley] exhausted his FMLA leave entitlement using the measurement method used by [the Town of] Marlborough—the Rolling Method—or either of the two methods he claimed he believes were in use," the method that measures from the start of the fiscal year or measuring "from his first approved use of FMLA leave for his own serious health condition." *Id*. at 14; *see also id.* at 23–24 (stating that on February 14, 2019, Mr. Foley claimed his FMLA leave should run from July 1 to June 30 and

that he later claimed it should run from August 22, 2018, which is when he was approved for FMLA leave due to his own health condition). According to Defendants, he used 62.25 hours for his mother's serious health condition in 2018 and by the time of his termination had used 549.25 hours of FMLA leave between 2018 and 2019 for both his mother's and his serious health conditions. *Id*. at 24 (arguing that Mr. Foley therefore used 487 hours for his own serious health condition).

Defendants argue that Mr. Foley was not prejudiced by any failure to provide notice, and therefore his interference claim fails as a matter of law and should be dismissed. *Id*. at 15–16 (citing *Amley v. Sumitomo Mitsui Banking Corp.*, 19 Civ. 3777 (CM) (BCM), 2021 WL 4429784, at *12 (S.D.N.Y. Sept. 27, 2021); *Craig v. Univ. of Conn. Health Ctr.*, No. 3:13-CV-0281 (VAB), 2016 WL 4536440 (D. Conn. Aug. 30, 2016)). According to Defendants, Mr. Foley was not prejudiced by a lack of notice because after the January 24, 2019 e-mail, he did not immediately raise a "complaint about how his time was being counted" and also "continued to take full-day absences." *Id*. at 22. Moreover, even after Ms. Traversa's February 13, 2019 e-mail to Mr. Foley alerting him that he had exhausted his FMLA leave entitlement on that day, Defendants did not immediately terminate him but instead "attempted to work with [Mr. Foley] for another three weeks," during which he continued to take unexcused absences. *Id*. at 14–15, 22. "Thus, [the Town of] Marlborough 'went above and beyond its obligations under the Act and provided [Mr. Foley] with additional leave beyond the twelve workweeks to which [he] was entitled.'" *Id*. at 23 (quoting *Stuart v. T-Mobile USA, Inc.*, No. 1:14-CV-04252, 2015 WL 4760184 (S.D.N.Y. Aug. 12, 2015)). And they note that in *Cunha*, a District of Connecticut court dismissed a claim "based on 'an alleged nine-day delay in notifying [the p]laintiff of his FMLA rights.'" *Id*. (quoting *Cunha v. WinnCompanies*, No. 3:13-CV-01789 (MPS), 2014 WL 2871588,

at *3 (D. Conn. June 24, 2014)). Defendants claim that there was "at most, a two-day delay in [Ms.] Traversa notifying [Mr. Foley] he was eligible for FMLA." *Id.* at 31. Moreover, there is no prejudice due to the delay in informing Mr. Foley that he would be eligible because he "at all times considered himself eligible for leave under the FMLA" and Ms. Traversa's response on January 24, 2017 "demonstrated she also considered him eligible in that she asked him to complete a Certification Form." *Id.*

Defendants claim that between February 13, 2019 and March 5, 2019, Mr. Foley was "notified that he had exhausted his FMLA leave entitlement at least sixteen (16) times prior to his termination on March 8, 2019." *Id.* at 22–23. According to Defendants, there is no genuine issue of material fact that Mr. Foley would have not changed his approach to using FMLA leave if the measurement method had been known earlier, because "after [Ms.] Traversa told him his leave was exhausted," he did not use the methods that he claimed were available to him, such as going to bed earlier and not attending his children's games. *Id.* at 24–25. Nor did he use these methods in accordance "with his claimed understanding that his FMLA leave was being measured on a fiscal year basis." *Id.*

Mr. Foley's motion for partial summary judgment and opposition to Defendants' motion for summary judgment revolves around Defendants' failure to provide notice. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 1 ("[T]he primary and deciding issue before the Court is whether the failure of Defendants to specify the applicable 12 month period that would apply to [Mr. Foley's] FMLA leave resulted in an interference with [Mr. Foley's] rights under the FMLA when Defendants terminated [Mr. Foley] for absences that should have been covered by that law."); *see also* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 13–17 (outlining the notice required by the applicable regulations). According to Mr. Foley, "[a]n employer that fails [to] advise an

employee of his or her substantive rights under the FMLA is liable for interference." Pl.'s Mem. in Supp. of Mot. for Summ. J. at 21 (citing *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 454 (6th Cir. 2005); *Fisher v. Rizzo Bros. Painting Contractors, Inc.*, 403 F. Supp. 2d 593, 599 (E.D. Ky. 2005)); *see also* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 16–17.

Mr. Foley says there is no dispute that he was not provided any of the notices required under 29 C.F.R. § 825.300(d)(6). Pl.'s Mem. in Supp. of Mot. for Summ. J. at 22. He notes that two other employees were provided completed WH-382 (Designation Notice) forms in response to requests for FMLA leave, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 3, 23, and that Ms. Crowley was informed that her entitlement would be calculated measured forward, *id.* at 23.

Because the law was not applied uniformly, because Defendants "failed to take affirmative steps to inform employees generally of a selected method for calculating leave," and because "Defendants failed to notify [Mr. Foley] in writing which calculation method would be used," Mr. Foley argues that "the law clearly and unequivocally required that [his] leave use be calculated using the most beneficial method to him, in this case, the calendar year method." Pl.'s Mem. in Supp. of Mot. for Summ. J. at 23–25; *see also* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 22 (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1117 (9th Cir. 2001) for the proposition that failure to notify an employee of the calculation method selected is "akin to the failure of the employer to choose a calculation method"). Summary judgment is therefore warranted, he argues, because he was terminated for failing to return after exhausting FMLA leave, but he was "'not afforded the opportunity to make informed decisions about [his] leave, based on the lack of FMLA notice provided to [him].'" *Id*. at 26 (quoting *Young v. Wackenhut Corp.*, Civil Action No. 10-2608 (DMC) (JAD), 2013 WL 435971, at *6 (D.N.J. Feb. 1, 2013)).

Mr. Foley argues that, like the court in *Young*, the Court should find summary judgment in his favor.

In reply to Defendants' motion for summary judgment, Mr. Foley acknowledges that "the Second Circuit has not addressed the precise issue . . . relating to the consequences of failure to notify an employee of the calculation method chosen," but argues that failure to notify may constitute interference "so long as that failure results in a prejudice to the employee." Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 21. According to Mr. Foley, "prejudice is established *per se* when the remedy provided by the regulation—the most beneficial outcome—is not afforded to the employee and the employee's employment is terminated for using leave that would otherwise have been covered by the FMLA." *Id.* at 22–23 (citing *Bachelder*, 259 F.3d at 1129). Moreover, "the common thread of prejudice that appears to manifest in different types of calculation cases is the notion that had proper notice been given, then the employee 'would have been able to make an informed decision about structuring his leave and would have structured it, and his plan of recovery, in such a way as to preserve the job protection afforded by the Act.'" *Id.* at 23–24 (quoting *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143–144 (3d Cir. 2004)), 28–30. In support, Mr. Foley cites to cases outside of the Second Circuit where courts have found that the plaintiff was prejudiced because they did not receive proper notice. *Id.* at 23–26.

Mr. Foley also does not agree with Defendants' calculation of his FMLA leave hours available, and claims that he still had hours available using either the rolling method or the calendar method. *Id.* at 30–34. He objects to their use of Ex. KK, "a summary of handwritten time off request forms and other written communications regarding [Mr. Foley's] requests for leave," because Ms. Traversa's affidavit "makes it clear that she created Ex. KK—a compilation—for the purposes of this litigation using Town records," and "the Town has not

produced all the documents in discovery that are relevant to that compilation." *Id*. at 30 n.14 (citing Ex. KK to Defs.' Mot. for Summ. J. at 2, ECF No. 107-43 (Dec. 3, 2021)). According to Mr. Foley, the exhibit is not admissible under either Rule 803(6) or Rule 1006. *Id*. Mr. Foley also claims that, as of December 6, 2018, the Town of Marlborough claimed that he had used 46.25 hours through fiscal year ending June 30, 2018, but they now claim he used 62.25 hours during the same period. *Id*. at 30.

As to Defendants' argument that they selected the rolling method prior to February 2019, Mr. Foley responds that the evidence shows Ms. Crowley was informed that the measured forward method would apply, and that even if this was an error, Defendants needed to provide 60 days' notice to all employees that it had selected a different method than the one communicated to Ms. Crowley. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 27. Defendants also cannot overcome "the rule that a failure to notify is akin to a failure to select." *Id*. And as to the argument that the 12 weeks were exhausted under methods that Mr. Foley believed were applicable, Mr. Foley claims that "it is clear in the case law that what [he] believed is not material—it is Defendants' obligation to notify in writing." *Id*. at 26 n.11 (citing *Casas v. Sch. Dist.*, 2014 WL 2988059, at *5 (M.D. Fla. July 2, 2014)). Mr. Foley also disputes the argument that Ms. Traversa attempted to discuss possible accommodations, because she "had a long history of negative interactions with [Mr. Foley] and had previously refused accommodations for this condition." *Id*. at 27 n.12.

In their opposition to Mr. Foley's motion for partial summary judgment, Defendants emphasize that they had clearly chosen a method, and that Mr. Foley was aware that one had been chosen, as noted in the DOL FMLA Report, which stated that Mr. Foley knew either the "rolling forward or backward" method was used. Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 15 n.3. Therefore, they argue, the "most beneficial method" need not be used, because "the

Regulations only state that the 'most beneficial method' will be used where an employer fails to select a calculation method at all." *Id.* at 15. They also argue that the Regulations do not set forth any penalty if the method is not applied consistently or if the employer does not provide notice of the method used. *Id.* at 17–18.

Defendants argue that *Ragsdale* "made clear that categorical penalties have no place in the FMLA and adopted a prejudice standard that the DOL made clear applies to the notice requirements." Defs.' Reply at 4 (citing *Ragsdale*, 535 U.S. at 88). In determining prejudice, the question is whether Mr. Foley would have changed his behavior had he been notified earlier that the Town of Marlborough used the rolling method. *Id.* at 5 (citing *Rodriguez v. Atria Senior Living Grp., Inc.*, 887 F. Supp. 2d 503, 515 (S.D.N.Y. 2012)); *see also* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 20–21 (citing *Sarno*, 183 F.3d at 161–62). As previously explained, defendants do not believe he would have because of his actions after January 24, 2019 and February 14, 2019. *See* Defs.' Reply at 6–7; Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 28. Thus, they argue, "[t]here is no genuine issue of material fact that Mr. Foley would not have changed his behavior had he known about the measurement method because he did not behave in a manner to conserve his time in accordance with the methods he claimed to have thought were applicable." *Id.* at 31.

As to Mr. Foley's argument that he did not exhaust his leave when measured under either the rolling method or the calendar year, Defendants argue that this is a new theory of liability "that Defendants had no opportunity to conduct discovery into and were not able to address in their Motion for Summary Judgment." Defs.' Reply at 8. Under Second Circuit precedent, they argue, an opposition "'is not the place for a plaintiff to raise new claims.'" *Id.* (citing *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010)). Defendants argue that Mr. Foley had

"never rais[ed] any issue about whether Defendants' calculation of his leave using the [r]olling [m]ethod was not accurate." *Id.* Even if the Court were to consider this argument, however, Defendants maintain that there is no genuine issue of fact as to their calculation of his FMLA entitlement because the tables they have submitted are working documents created before any legal complaint was filed, *id.* at 9–10, and the hours they have counted as FMLA leave were properly counted as such, *id.* at 10–11.

In his own reply, Mr. Foley advances many of the arguments discussed earlier, and also alleges that the DOL FMLA Report's factual findings about his knowledge of the method used are hearsay statements. Pl.'s Reply at 2. As to the argument that Defendants checked the wrong box on Ms. Crowley's form, Mr. Foley argues that a jury is not required to believe this claim and therefore Defendants are unable to establish that they selected a method to be used for Mr. Foley's FMLA leave and the method providing the most beneficial outcome had to be applied. *Id.* at 7. Failure to apply the most beneficial outcome was prejudicial as a matter of law because this failure led to termination. *Id.* at 9. Prejudice, he argues, is shown not by what he did in the three weeks after being told that his leave was exhausted but by what he could have done differently between when he first applied for FMLA leave to care for his mother (February 26, 2018) and when he was told his leave was exhausted (February 13, 2019). *Id.* at 9–10.

The Court disagrees with both parties.

First, the Court clarifies that there is no private cause of action for a technical violation of the FMLA. *Ragsdale*, 535 U.S. at 91 (concluding that a regulation, which held that FMLA leave does not count toward an employee's FMLA entitlement if the employer does not designate it as FMLA leave, was an impermissible alteration of the statutory framework because it transformed the company's failure to give notice—along with its refusal to grant her more than 30 weeks of

44

leave—into an actionable violation of § 2615); *Sarno*, 183 F.3d at 162 ("[T]o the extent that [the

plaintiff] contends that the assumed right to notice stands as an independent right under the Act,

and that an employee may sue the employer for failure to give notice even if that failure in no

way affected the employee's leave, benefits, or reinstatement, we reject that contention."); *see

also, e.g.*, *Ferguson v. Lander Co., Inc.*, Civ. Action No. 3:06-CV-0328 (DEP), 2008 WL

921032, at *19 (N.D.N.Y. Apr. 2, 2008) ("While a technical violation of the FMLA has been

established, plaintiff has provided the court with no authority to suggest that the violation in and

of itself gives rise to a private right of action, and what limited authority the court has uncovered

suggests otherwise." (citing *Saroli*, 405 F.3d at 453)). Any failure to notify, then, must be

assessed in the context of an interference claim.

When a plaintiff receives the full twelve weeks of FMLA leave, courts generally do not

find interference. *Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1, 5 (2d Cir. 2020)

(summary order) ("Because [the plaintiff] received all the time she requested and has not

otherwise shown that her personal leave was somehow inferior to leave under the FMLA, [the

plaintiff] has not shown that she was denied a benefit owed to her under the FMLA."); *Sarno*,

183 F.3d at 161–62; *De Oliveira v. Cairo–Durham Cent. Sch. Dist.*, No. 1:11–CV–393

(NAM/RFT), 2014 WL 4900403, at *19 (N.D.N.Y. Sept. 30, 2014) (granting summary judgment

on an interference claim because, among other things, the plaintiff had "adduce[d] no evidence

showing that [the defendant] discouraged her in any way from utilizing her FMLA leave"); *Bond

v. Sterling, Inc.*, 77 F. Supp. 2d 300, 306 (N.D.N.Y. 1999) ("Since Plaintiff was given the leave

which she requested and was entitled to under the FMLA (a fact she does not dispute), her claim

. . . that defendants interfered with that right must be dismissed"); *see also, e.g.*, *Geromanos v.

Columbia Univ.*, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004) ("Because plaintiff received the full

twelve weeks of leave as allowed by the act, the only other right with which Columbia could be found to have interfered is the right to reinstatement at the end of her leave."). The parties, however, disagree as to whether Mr. Foley used his full twelve weeks of leave under any of the calculation methods. Thus, it is for a jury to determine whether Mr. Foley used his full FMLA leave time.

For now, the Court clarifies that Exhibit KK is likely admissible as a business record created in the regular course of business. Aff. of Amy Traversa ¶ 6, ECF No. 122-1 (Feb. 4, 2022) ("To be perfectly clear, I created the table in the regular course of business while First Selectman of Marlborough using documentation kept by Marlborough in the regular course of its business."). Also, Mr. Foley is not prevented from challenging whether he used his full FMLA leave time. Unlike in the *Lyman* case, Mr. Foley is not raising a new theory of liability or making a new claim. He is simply disputing a genuine issue of fact material to his interference claim.

To find interference for failure to notify, Mr. Foley must establish that he was prejudiced by that failure. *Roberts*, 308 F. App'x. at 569 (summary order) ("To bring a successful action under the FMLA, an employee must show . . . that the employee has been prejudiced by the violation." (citing *Ragsdale*, 535 U.S. 81)); *see also Cunha*, 2014 WL 2871588, at *3 ("Courts have held consistently that failure to notify an employee adequately of his FMLA rights constitutes interference with those rights only if the employee is able to establish that he was prejudiced by that failure."). Prejudice also must be established where the plaintiff is complaining about a delay in notification. *See Cunha*, 2014 WL 2871588, at *3 ("A plaintiff must also establish prejudice when there has been a delay in notification of FMLA rights."). Courts find no prejudice where the employee would have been unable to change the way they used their FMLA leave, even if they had received proper notice. For example, if the need for

leave was immediate and unanticipated. *See Sarno*, 183 F.3d at 161–62 ("[The plaintiff's] right to reinstatement could not have been impeded or affected by the lack of notice because his leave was caused by a serious health condition that [made him] unable to perform the functions of his position[.]" (internal quotation marks omitted) (citing 29 U.S.C. § 2612(a)(1)(D)); *see also, e.g.*, *Donnellan v. N.Y.C. Transit Auth.*, No. 98 Civ. 1096 (BSJ), 1999 WL 527901, at *4 (S.D.N.Y. July 22, 1999) ("For example, where an employee uses leave which might be counted as vacation time, FMLA leave, or both, an employer's failure to provide notice that the leave counts against the FMLA allotment might interfere with the employee's ability to plan and use future FMLA leave to, for example, schedule elective surgery and recuperate from the surgery."). This is not the case here.

Mr. Foley cites to two cases from the Sixth Circuit that are both not binding and factually distinct from this case.

In *Saroli*, the Sixth Circuit found that the district court should not have granted the defendants' summary judgment on the plaintiff's interference claim where defendants did not respond to the plaintiff's notice that she intended to take FMLA leave, they did not inform the plaintiff that she was eligible to take twelve weeks and instead only offered six weeks of leave, and they required that the plaintiff present a fitness-for-duty certification when she returned to work. *Saroli*, 405 F.3d at 454.

Similarly, in *Fisher*, the District Court for the Eastern District of Kentucky concluded that summary judgment was not appropriate where the plaintiff claimed that the defendant "failed to properly advise her of her substantive rights under the FMLA." *Fisher*, 403 F. Supp. 2d at 599. In *Fisher*, the plaintiff met with the defendant to discuss leave options after her doctor advised a leave of absence from her job because of complications regarding her pregnancy, and

the defendant simply informed her that they "did not offer short-term disability benefits, and that any leave would be unpaid," but never mentioned that the leave was offered under the FMLA and the plaintiff did "not recall whether she was told that the unpaid leave was finite in duration and accompanied by an automatic right to reinstatement." *Id.* at 595–96.

In this case, Defendants undeniably failed to provide Mr. Foley with the proper notices. Defendants did not notify all employees of a calculation method until October 2019. *See* Ex. 100 to Pl.'s Opp'n to Summ. J. at 9–11, ECF No. 120-2 (Jan. 21, 2022) (March 16, 2021 Deposition of Amy Traversa) ("Q: Do you agree with me that the town's personnel rules handbook, which was in effect in 2017, 2019, does not advise the employee of which of the four potential methods of calculating the twelve-month period is being used by the town, eg., calendar, fiscal, rolling? A: Yes, I agree. . . . Q: So this form – would you agree with me that this form, this poster, like the handbook does not inform the employee of which of the four methods of calculating the twelve-month period that the Town of Marlborough uses? . . . A: Yes, I – I agree with that statement."); *Id.* at 13 ("Q: So in 2019, October of 2019, which is the date of this book, personnel manual, was the first time that the town listed that information in the personnel rules themselves, right? A: Correct."); *Id.* at 15–16 ("Q: But I'm just trying to nail down this one fact whether the town claims that Mr. Foley was [in]formed, at any time, in writing, that his – of the method at which they would calculate the twelve months and the twelve weeks as we've been discussing, calendar year, fiscal year, rolling? A: It – I don't know that he was. I don't know that there is any documentation that he was notified in writing."); Ex. OOO at 11 ("Q: How did the first selectman communicate that she had selected the 'rolling' 12? A: She had told me. Q: All right. Do you know of any document in existence at the Town that demonstrates the first selectman chose the 'rolling' 12 method applicable to FMLA requests at the Town? A: I don't.").

And regardless of whether a calculation method had been selected by the time that Mr. Foley was attempting to take leave, he himself was not informed of the method until either January or February 2019. The regulation requires that the employee requesting FMLA leave receive "specific notice" which "must include . . . the applicable 12-month period for FMLA entitlement." 29 C.F.R. § 825.300(c)(1)(i). It does not state that the notice requirement is satisfied if the employer has selected a method of which the employee is unaware.

Regardless of whether Defendants notified Mr. Foley of the proper calculation method in January 2019 or February 2019, the question is whether he was prejudiced by the failure to notify him earlier. *See e.g.*, *Fritz v. Eye Ctr.*, Civil No. 3:10-CV-33 (JCH), 2010 WL 3210863, at *3 (D. Conn. Aug. 12, 2010) ("If there are issues of fact which, if true, would establish that plaintiff was somehow hindered from exercising her rights by defendant's failure to provide notice of the protections afford under the [FMLA], plaintiff may state [an interference claim]." (internal citation and quotation marks omitted)); *see also Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 723–24 (2d Cir. 2001) (discussing a district court's finding that "a distinct cause of action lies for an employer's failure to post a notice where that failure leads to some injury" and explicitly declining to address the "validity" of that type of claim).[3]

And contrary to Mr. Foley's suggestion, prejudice is not established *per se* under these circumstances. *See, e.g.*, *Stuart*, 2015 WL 4760184, at *4 ("Plaintiff does assert in conclusory fashion that she felt pressured to come back early from her medical leave . . . but she conspicuously fails to identify a single instance in which she delayed or cut short her leave as a

---

[3] Both in his opposition to the Defendants' motion for summary judgment, Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 20, and at the motion hearing held on August 24, 2022, Plaintiff relied on the Sixth Circuit's decision in *Thom v. Am. Standard, Inc.*, 666 F.3d 967, 974 (6th Cir. 2012). In *Thom*, the Sixth Circuit rejected the defendant's argument that they had constructively notified the employee of the selected method for calculating leave. In addition to not being bound by the Sixth Circuit's case law, this Court also finds *Thom* to be inapplicable, as the operative question under Second Circuit case law is whether Mr. Foley was prejudiced by the failure to properly notify.

result of Defendants' actions."). Thus, there is a genuine issue of material fact as to whether he was prejudiced.[4]

According to Mr. Foley, he would have altered the way in which he used his FMLA time had he known the applicable calculation method. Ex. LLL to Defs.' Mot. for Summ. J. at 38–39, ECF No. 107-70 (Dec. 3, 2021) (November 18, 2020 Deposition of Mr. Foley) ("Ex. LLL") ("A: So, like I said, the smaller block – in other words, I applied for, or I received a leave in September 2018, and then not knowing that my mother's FMLA time was in there – so if I had known in September that my mother's time was included, I could have tried to use that medication – maybe I could have tried taking it a little bit earlier in the night where I could have come in late. I just could have altered it a little bit. In other words, I have to get sleep somehow, and it's hard for me to designate exactly how it would be used because I do have children and stuff like that, but there's certain instances where I knew that my FMLA time was going to be in the block that it was in, I could have used the medication a bit differently."); *id.* at 40 ("A: . . . . So I had family responsibilities, okay, I'll use that as an example. If I had to take my son to basketball at 8:00 at night or 7:00 at night, and I didn't sleep the night before. If I knew that my FMLA time was the way that Traversa claims it was administered, the rolling method or whatever it is, I could have probably made other arrangements for my children so I could have gone to sleep earlier, so I would have been able to either come in on time or come in later.").

---

[4] Mr. Foley argues that *Young v. Wackenhut Corp.*, Civil Action No. 10-2608 (DMC)(JAD), 2013 WL 435971, at *4 (D.N.J. Feb. 1, 2013) is a "factually similar" case where the District Court of New Jersey granted summary judgment to the plaintiff because their employer had failed to provide individualized notice as required by the FMLA. The court in *Young* found prejudice where the failure to provide notice had not allowed the plaintiff to make an informed decision on how to structure her leave. *Id.* at *5. Mr. Foley, however, fails to mention that the court in *Young* emphasized that the plaintiff was not informed of the need to return to work until the day when her leave expired, and the plaintiff was fired the following day. *Id.* The case also cites to Third Circuit case law where plaintiffs similarly were not provided a date to return to work by and were terminated as soon as they returned to work. *Id.* at *5–6. By contrast, here Mr. Foley was informed ahead of time that he had allegedly almost exhausted his leave, alerted when he had exhausted his leave, and terminated only after attempts to speak with him about his return to work.

Defendants' argument — that he would not have changed his behavior because he did not change them after January 24, 2019 or February 14, 2019 — are for a jury to consider and weigh against Mr. Foley's own claims that he would have altered his behaviors had he known sooner, and that he may have attempted to alter them after January 24, 2019 and February 14, 2019. Ex. LLL at 41–42 ("Q: Did you modify your ingestion of medication when you were told that you had run out of FMLA time? A: I might have. Again, I don't remember each instance that I did. My guess is I probably did the best I could to come to work, I can tell you that. . . . Q: All right. Did you ask anybody else to help you with taking children to events? A: Again, I don't remember that far back.").

To be clear, there is no genuine issue of fact as to whether Mr. Foley was prejudiced by the delay in notifying him as to his FMLA eligibility. There is only a genuine issue of fact as to whether he was prejudiced by the lack of notification regarding the applicable calculation method. The potential prejudice, however, is not clear enough to find that summary judgment should be granted in Mr. Foley's favor.

Accordingly, summary judgment must be denied as to both Defendants and Mr. Foley on the interference claim based on the failure to notify.

### b.  Defendants' Follow-Up Inquiries

As to the Certification Forms and any follow up discussions concerning the forms, Defendants argue that their inquiries about Mr. Foley's claimed serious health condition "were necessary due to inconsistencies, ambiguities, and contradictions in the Certification Forms he provided" for each of his four FMLA requests. Defs.' Mem. in Supp. of Mot. for Summ. J. at 31–39 (citing *Porter v. Donahoe*, 484 F. App'x 589, 590 (2d Cir. 2012) (stating that employers may request that FMLA requests "be supported by a certification issued by the health care

provider of the family member for whom the employee is caring" and that a certification is incomplete "if one or more of the applicable entries have not been completed" and insufficient "if the entries are completed, but the information provided is vague, ambiguous, or non-responsive" (internal citation and quotation marks omitted))). Specifically, as to Mr. Foley's request for intermittent leave in order to care for his mother, Defendants argue that Ms. "Traversa's questions were specifically focused on the form and establishing a schedule for [Mr. Foley's] absences" because 29 C.F.R. § 825.302 requires that the employee and employer "work out a schedule for such leave that meets the employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider." *Id*. at 36 (internal citation and quotation marks omitted). Defendants note that when Mr. Foley said he could not provide specificity as to when appointments would take place, Ms. Traversa "did not ask for further specificity," approved his leave, and asked for notice on when he would be out to plan around Mr. Foley's schedule. *Id*. at 37. Defendants also add that the inquiries did not prejudice him in his ability to take FMLA leave. *Id*. at 31.

The Court agrees.

Mr. Foley has not responded to this allegation, and in his filings only lists the follow-up inquiries as evidence of Mrs. Traversa's alleged adverse actions related to the retaliation claim. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 38. To the extent that Mr. Foley claims that the follow-up inquiries interfered with his FMLA rights, Am. Compl. ¶¶ 32, 34, an employer is entitled to "require that request for leave be supported with health care provider information." *Blodgett v. 22 S. St. Operations, LLC*, No. 3:17-CV-766 (VAB), 2019 WL 2913844, at *6 (D. Conn. July 8, 2019) (citing 29 C.F.R. § 825.306(e) ("In all instances in which certification is requested, it is the employee's responsibility to provide the employer with complete and

sufficient certification and failure to do so may result in the denial of FMLA leave.")); *see also Graziadio*, 817 F.3d at 426 ("Under the FMLA, an employee seeking leave need not submit a medical certification *unless and until one is specifically requested by her employer.*" (emphasis in original)).

In *Graziadio*, the Second Circuit did not find fault with the employer's request for additional information to cure deficiencies but rather with the employer's failure to acknowledge or respond to the employee's new certification, which contained sufficient information for a jury to conclude that "it supported [the employee's] request for ongoing, intermittent leave." *Graziadio*, 817 F.3d at 425–26. The record shows that the Certification Forms provided contained either deficiencies or contradictions that required clarification, and that on at least one occasion, the physician's recommendation suggested that Mr. Foley did not require leave because he was provided sufficient protection at work.

Accordingly, the Court finds that Mr. Foley does not have an interference claim, as it relates to Defendants' follow-up requests for additional information.

### c. Denial of Mr. Foley's First and Second FMLA Leave Requests

Defendants argue that they properly denied Mr. Foley's first two requests for FMLA leave because he did not show that he had a serious health condition which prevented him from performing the essential functions of his role at work. Defs.' Mem. in Supp. of Mot. for Summ. J. at 39. His leave was finally approved when "Dr. Divino made the connection that [Mr. Foley's] tinnitus caused him difficulty sleeping, which could be severe enough to impair his ability to operate trucks and tractors[.]" *Id.* at 40. Prior to that, the earlier denials "were entirely based on the requirements of the FMLA that to qualify for leave an employee must establish the

existence of a serious health condition that prevents the employee from performing the essential functions of his job." *Id*.

Moreover, they argue, he was not prejudiced by these denials because he "was able to use other types of leave and/or was able to work." *Id*. at 40–41 (citing *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 17–19 (D. Conn. 2016); *Drivers v. Metro Jewish Health Sys.*, No. 06-CV-6704 (RRM) (JMA), 2009 U.S. Dist. LEXIS 2312, at *63 (E.D.N.Y. Jan .14, 2009)).

In support of his own motion for partial summary judgment, Mr. Foley argues that "[i]t [was] clear based on medical information provided to Defendants by [his] physicians that [his] condition of tinnitus which, along with the significant sleep disturbance it caused him, required continuing treatment by a health care provider, qualifies as a serious health condition entitling him to FMLA leave." Pl.'s Mem. in Supp. of Mot. for Summ. J. at 18. Under 29 C.F.R. § 825.203(c), he "was entitled to take intermittent FMLA leave when medically necessary not only for treatment for his condition, but also for recovery from the condition itself." *Id*. at 19.

In *Graziadio*, the Second Circuit found that a jury could find that the employee's certification form "met the statutory requirements for certification" where the certification indicated that the employee's son would need to visit a doctor every 3 months for 1-2 hours, that he may have "episodic flare-ups" and "sick & recovery days requiring supervision and ongoing treatment" which were "unpredictable and necessitate immediate action." *Graziadio*, 817 F.3d at 425–26 (internal citations and quotation marks omitted). The Court thought it was "reasonable" for the employer to reject the doctor's note because "it did not state that there was any medical necessity for [the employee] to provide full time medical care [to her son]," and only overturned the district court's granting of the summary judgment motion because of the employer's

subsequent actions that did not provide the employee an opportunity to provide sufficient information to demonstrate a medical necessity. *Id.* at 428.

By contrast, Mr. Foley was given several opportunities to show a medical necessity. There is no genuine issue of material fact as to whether he was entitled to FMLA leave for his tinnitus. The certifications and information provided by his physician make clear that he did not require leave. Ex. LLL at 9 ("A: You know, like I said, you know, the little bit of research I did online indicated that it was a serious health condition."); *Id.* at 12 ("Q: Isn't Dr. Sawyer saying as long as you wear ear protection you're fine? A: I'm fine for – Q: To work. A: Yes."); *Id.* at 16 ("Q: Here again First Selectman Traversa is asking Dr. Sawyer what job functions you could not perform, and Dr. Sawyer's response is 'The only job that he is unable to perform is plowing snow.' Do you see that? A: Yes, I do. Q: And it says, 'Beyond that, otherwise he can perform all job duties, and he is aware that in certain aspects of his job he will need to continue to wear ear protection which would not preclude him from working at that job.' Do you see that? A: Yes, I do."); *Id.* at 35–36 ("Q: As I've just asked you the questions, I explained to you how Amy Traversa told you that there were various questions and contradictions. You agreed that there were contradictions, did you not? . . . A: In some of the certification forms I believe so."); Ex. NNN to Defs.' Mot. for Summ. J. at 9, ECF No. 107-72 (Dec. 3, 2021) (March 16, 2021 Deposition of Amy Traversa) ("Q: And what were you trying to figure out, in terms of his qualifications? A: I was looking for consistency in the answers. I was looking for answers to say, yes, he needed to miss work due to his serious medical health condition, and it wasn't there."). Dr. Sawyer made clear that he did not believe Mr. Foley had a serious health condition. Ex. L.

Accordingly, the Court finds that Mr. Foley does not have an interference claim, as it relates to the denial of his first two FMLA leave requests.

### d. Requiring Mr. Foley to Take More FMLA Leave Than Needed

Finally, Defendants argue that Mr. Foley is barred from bringing any claim based on his being initially required to take full days of leave "rather than allowing him to take leave in 'an increment no greater than the shortest period of time that the employer uses to account for use of other forms of leave provided that it is not greater than one hour[.]'" Defs.' Mem. in Supp. of Mot. for Summ. J. at 41 (quoting 29 C.F.R. § 825.205). This is because the Town of Marlborough began allowing Mr. Foley to take FMLA leave in increments after it was informed by the DOL that it was required to do so. *Id.* at 41–42. It also paid him for the time he would have worked if he had not been required to take full days of leave, and it returned that time to his "FMLA leave bank." *Id.* at 42. Moreover, the letter to the DOL "specifically stated that the payment was conditioned upon the execution by Mr. Foley of the enclosed Form WH-58 dated 06/19/2019," *id.* at 42 (internal citation and quotation marks omitted), and the DOL Receipt for Payment form submitted with the payment stated,

> NOTICE TO EMPLOYEE: Your acceptance of this payment of wages and/or other compensation due under the Fair Labor Standards Act (FLSA) or Family Medical Leave Act (FMLA), based on the findings of the WHD means that you have given up the right you have to bring suit on your own behalf for the payment of such unpaid minimum wages or unpaid overtime compensation for the period of time indicated above and an equal amount in liquidated damages, plus attorney's fees and court costs under Section I 6(b) of the FLSA or Section 107 of the FMLA.

*Id.* at 42 (internal citation and quotation marks omitted). Because the check provided with the receipt was deposited, Mr. Foley's "claims based on [the Town of] Marlborough requiring him to take time in increments greater than one hour are therefore waived, along with any other claims arising in the released time period." *Id.* at 43.

The Court agrees.

Mr. Foley's filings did not argue for summary judgment on the interference claim based on his being required to take more FMLA leave than needed. The Court finds that he clearly and knowingly waived any compensation due under the FMLA based on the additional leave he was mistakenly required to take. Ex. LLL at 36 ("Q: Did the Department of Labor present you with a resolution that a certain amount of money would be paid to you by the employer? A: Just in regards to the – so I was trying to come into work, like, around 9 or 10:00 in the morning, and I was advised to take the complete day off. So the town agreed to pay the difference because the Department of Labor recommended that. Q: Right. Did you receive a check for that time period? A: Yes, I did. Q: Did you cash the check? A: Yes, I believe it did get cashed."); *id.* at 37 ("Q: So as of December 20, 2018, the Town informed the DOL that it would pay for October 16, 24 and 25 of 2018, correct? A: I believe so. Q: And you received the payment from the Town for that, correct? A: Yes, I did.").

As to whether the additional time he was mistakenly required to take was returned to his FMLA leave bank, this remains a question to be resolved by a jury in determining whether Mr. Foley exhausted his FMLA leave.

Accordingly, the Court finds that Mr. Foley does not have an interference claim, as it relates to his being required to take more FMLA leave than necessary.

### 2.  Retaliation in Violation of the FMLA

To establish a prima facie case of FMLA retaliation, the Plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a

legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). The plaintiff must produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by [the defendant] were false, and that more likely than not discrimination was the real reason for the employment action." *Serby v. N.Y.C. Dep't. of Educ*, 526 F. App'x. 132, 135 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

At this stage, "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)). Retaliation claims thus proceed in three parts. First, "[i]f a plaintiff sustains the initial burden, a presumption of retaliation arises." *Id*. Second, "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998)). Third, "once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (citing *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120–21 (2d Cir. 1997)).

Defendants argue that Mr. Foley cannot establish a prima facie case of retaliation because he exhausted his leave, was given multiple warnings and opportunities to discuss an accommodation with the Town of Marlborough prior to termination, and continually failed to attend work after exhausting his leave. Defs.' Mem. in Supp. of Mot. for Summ. J. at 28.

According to Defendants, these are "legitimate non-discriminatory reason[s] for his termination." *Id*. Mr. Foley's "continued full-day, unexcused absences—taken without prior notice—caused significant hardship to [the Town of] Marlborough," as Mr. Foley was only one of three maintainers in the Department of Public Works. *Id*. at 29. Defendants also argue that the temporal proximity between his protected leave, which expired as of February 13, 2019, and his March 8, 2019 termination is "insufficient to demonstrate that the termination of his employment based on the unexcused absences was a pretext for discrimination." *Id*. at 28–29 (citing *Hewett*, 171 F. Supp. 3d at 21; *Rinaldi v. Quality King Distributors, Inc.*, 29 F. Supp. 3d 218, 232 (E.D.N.Y. 2014)). According to Defendants, Mr. Foley's termination does not raise an inference of discrimination because he was told sixteen times that he had exhausted his FMLA leave and yet continued to take unexcused absences, and Defendants "continued to offer to meet with him and to permit him to attend work notwithstanding his unexcused absences, until his absences became unbearable." *Id*. at 29.

Mr. Foley responds that summary judgment should not be granted on the retaliation claim because evidence supports a finding that his termination was causally related to the protected activity by "the close proximity of the adverse action" as well as "additional evidence of both ongoing adverse actions and [Ms. Traversa's] motive to retaliate against [Mr. Foley] based on his use of FMLA [l]eave in 2018." Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 36–39 (citing *Graziadio*, 817 F.3d at 429; *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). The adverse actions, according to Mr. Foley, include "seeking medical information beyond the Certificate Health Care Provider, harassing [him] over the timing and length of FMLA leave connected to his [m]other's chemotherapy treatments, contacting [his] physicians directly and without [his] consent," requiring him to take FMLA leave in 8-hour increments, "threatening to

deny leave unless [he] signed a HIPAA authorization in September 2018, refusing to . . . grant leave because [Ms. Traversa] did not understand the meaning of 'heavy equipment,'" and selecting the calculation method that was most detrimental to Mr. Foley. *Id.* at 38.

Mr. Foley claims to have "presented detailed evidence of Defendant Traversa's hostility toward [his] use of the FMLA which was ultimately a negative factor in her treatment of [Mr. Foley] at every turn over the two years in questions leading to the termination of his employment in March of 2019." *Id.* at 2. Mr. Foley also argues that Defendants' reason for terminating him— that he continued to use FMLA leave when it had been exhausted—lacks legitimacy because it "cannot be established on this record and there are genuine issues of material fact going to the calculation created by Defendants for this litigation." *Id.* at 2, 36.

In reply, Defendants argue that he was "treated the same way as similarly-situated employees who did not engage in the protected conduct" upon which he bases his claim of retaliation. Defs.' Reply at 12. Therefore, they argue, summary judgment should be granted on the retaliation claim.

The Court disagrees.

Temporal proximity can provide a basis for a causal connection. *See, e.g.*, *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (reversing a grant of summary judgment where plaintiff had demonstrated temporal proximity and the evidence provided "a sufficient basis to send the question of the school's retaliatory intent to the jury to reach a final determination."). But where "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir.

2013) (finding no prima facie case of FMLA retaliation where the plaintiff began receiving negative evaluations and letters in her file before her application for her first FMLA leave); *see also Elliot-Leach v. N.Y.C. Dep't. of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [Plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails.").

Mr. Foley admits that he had been previously reprimanded for "unexcused absences and leaving work without prior authorization," as early as 2007 and again in 2017, before his FMLA requests. Pl.'s 56(a)(2) Statement ¶ 5; *See Hewett*, 171 F. Supp. 3d at 20 (finding that though the plaintiff alleged that the employer had complained about the plaintiff's absences and inconsistent hours caused by the need for medical care and treatments, the plaintiff subsequently "received accommodation for her hours" and also "failed to produce any evidence that [the employer] continued to harbor retaliatory animus regarding those absences such that he would seek to fabricate or overstate the evidence regarding her poor performance"). But whether Defendants' attempts to gather more information about Mr. Foley's requested FMLA leave were "adverse actions" sufficient for a finding of retaliation is an issue for the jury. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997) ("If reasonable minds could differ as to the import of the evidence . . . and if . . . there is evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." (internal citations omitted)); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

Defendants have also presented a valid, non-discriminatory reason for terminating Mr.

Foley: his continuous absences after being informed that he had exhausted his FMLA leave time.

But, again, whether Mr. Foley exhausted his leave is an issue for the jury, and whether

Defendants believed Mr. Foley had exhausted his leave, had informed him of the exhaustion, and

attempted to work with him on finding a resolution that would be beneficial to him, while easing

the hardship caused on the Town of Marlborough from losing one of its three maintainers in the

Department of Public Works, are also issues for the jury. *See Shane*, 112 F.3d at 59; *Hayes*, 84

F.3d at 619.

Accordingly, Defendants' motion for summary judgment will be denied, as to Mr.

Foley's retaliation claim.

### B.  Motion to Compel

The Town of Marlborough argues that it requires, as requested in the subpoena served to

Indeed on April 7, 2021,

> '[A]ll job postings on www.indeed.com, from March 8, 2019 to the present, for landscaping and retail jobs in Andover, Bolton, Bozrah, Canterbury, Chester, Colchester, Columbia, Cromwell, Durham, East Haddam, East Hampton, East Hartford, East Lyme, Essex, Franklin, Glastonbury, Griswold, Haddam, Hartford, Hebron, Lebanon, Ledyard, Lyme, Manchester, Mansfield, Marlborough, Middlefield, Middletown, Montville, Newington, Norwich, Portland, Preston, Rocky Hill, Salem, Scotland, Sprague, Waterford, Wethersfield, West Hartford, and Windham, CT.'

Mot. to Compel. at 1 (quoting Ex. A to Mot. to Compel at 2, ECF No. 95-4 (Oct. 1, 2021)).

Instead of producing the requested documents, Indeed, by letter dated April 19, 2021, objected.

*Id*. at 1. According to the Town of Marlborough, Indeed objected despite the Town of

Marlborough's "offer to narrow the scope of the requested records, wait five weeks for the

records, and sharing in the reasonable costs associated with the retrieval of archived job

postings." *Id*. The Town of Marlborough now moves the Court to grant a motion compelling Indeed to comply with the subpoena and provide an affidavit authenticating the requested documents and attesting to the facts necessary to establish their admissibility "in support of a dispositive motion or at trial." *Id*. at 2.

The Town of Marlborough claims that the information requested from Indeed is necessary to demonstrate that Mr. Foley failed to mitigate his damages following termination. *Id*. at 2. Mr. Foley testified that he believes to have used Indeed.com to conduct his job search, but that he received no responses to his applications because he does not have a high school diploma. Mot. to Compel Mem. at 2. The Town of Marlborough wishes to "demonstrate that there were numerous job opportunities available to [Mr. Foley], yet he failed to apply to these positions to obtain gainful employment and mitigate his damages." *Id*.

The Town of Marlborough argues that the "'permissible scope of discovery from a non-party is generally the same as that applicable to the discovery sought from parties . . . .'" Mot. to Compel Mem. at 4 (quoting *Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 92 (D. Conn. 2012). Applying the same permissible scope of discovery, it argues, Indeed should be required to provide the requested documents because it is unable to demonstrate undue burden and, even if there is a burden in producing the documents, the "balancing exercise requires Indeed to comply with the Subpoena." *Id*. at 4–5, 8 (citing Fed. R. Civ. P. 26(b)(1) and Fed. R. Civ. P. 45(a)(1)(D)). Moreover, the Town of Marlborough notes that it has informed Indeed "that it was willing to share in the reasonable costs associated with retrieving the Requested Documents, limit the time frame for which it is seeking the Requested Documents, and limit the scope of records sought." *Id*. at 6–7.

The Town of Marlborough argues that Indeed's reasons for objecting to the subpoena are unavailing. First, it argues that the Stored Communications Act and other privacy laws are inapplicable because "user content information, including job applications, resumes, cover letters, [and] messages" are not requested by the subpoena. Id. at 5. (citing 18 U.S.C. § 2511). Second, they argue that Indeed is not being forced to serve as an expert witness because the Town of Marlborough "is merely seeking documentation showing jobs that were available to [Mr. Foley] in order to show that he failed to mitigate his damages." *Id*. at 6.

Finally, the Town of Marlborough argues that its "request in the Subpoena is not overly broad and is highly relevant to [the Town of] Marlborough's defense of mitigation of damages," in order to counter Mr. Foley's claim that he "'applied online to quite a few places' but that he was limited because employers 'ask for a high school diploma.'" *Id*. at 7 (quoting Ex. H to Mot. to Compel at 7–8, ECF No. 95-11 (Oct. 1, 2021)). The Town of Marlborough claims that it "exhausted all other reasonable methods at its disposal to obtain this information" because the historical data is not viewable on any website or public domain. *Id*.

In response, Indeed raises four arguments. First, that the subpoena imposes an undue burden and expense on Indeed, a non-party, and the burden imposed "is not proportional to the needs of the case." Opp'n to Mot. to Compel at 1, 9. In order to run the requested searches and produce responsive documents, Indeed would "need to search across multiple proprietary Indeed systems for landscaping and retail jobs to create a list of jobs that appeared on the website during the time-period set forth in the Subpoena" and then would have to review the posts for responsiveness and save the relevant portions. Opp'n to Mot. to Compel at 3–4. It estimates that it would take approximately 15 hours to produce the results of just one search term for a one-

year period. *Id*. at 4 (citing Decl. of Joshua Kim ¶ 8, ECF No. 101-1 (Oct. 27, 2021) ("Kim Decl.")).

Indeed further notes that even if it expended all the resources necessary to run these searches, it "is only one job site among a number of competitors," and the Town of Marlborough is not even able to confirm whether Mr. Foley had an account on Indeed. *Id*. at 4–5. Indeed draws attention to Mr. Foley's deposition, where he was asked about several well-known job sites and "agreed that 'Indeed sounds familiar,'" as one of the websites from which he received e-mails. *Id*. at 5, 7–9. Indeed informed the Town of Marlborough that it would be able to pull documents from Mr. Foley's account, but the Town of Marlborough has determined this search "would not result in useful information." *Id*. at 5. Instead of requesting the documents, Indeed argues, the Town of Marlborough should ask Mr. Foley to produce the e-mails he allegedly received from Indeed and inquire of him whether he applied for those jobs. *Id*. at 9.

Second, Indeed argues that the Town of Marlborough "is improperly seeking to use Indeed as its unretained expert . . . to provide information regarding the job market in Connecticut for retail and landscaping jobs during the relevant time period." *Id*. at 10. In support, Indeed notes that the Town of Marlborough refused to ask Mr. Foley to execute an authorization form so that Indeed could provide the Town of Marlborough with Mr. Foley's user account, which would provide any "jobs he applied for, correspondence he had with potential employers and job applications he submitted." *Id*. at 9. The question of whether suitable work existed, which Indeed notes is the Town of Marlborough's stated purpose for requesting the documents, "is properly addressed by a vocational expert." *Id*. at 10–11.

Third, Indeed argues that the subpoena should be denied for seeking duplicative and cumulative evidence, because the Town of Marlborough has already received similar documents

from other non-party employment websites. *Id*. at 11. Therefore, "[t]here is no reason why it needs similar documents from yet another source[.]" *Id*.

Finally, Indeed claims that the Stored Communications Act does prohibit it "from disclosing the contents of electronic communications." Id. at 12 (citing 18 U.S.C. § 2701(a)). Specifically, the Stored Communications Act prohibits disclosure of electronic communications that are not readily accessible to the general public. *Id*. (citing 18 U.S.C. §§ 2511(2)(g)(i), 2702(b)(1)–(9)). The listings are no longer public because "[t]he employer who listed the job either set an expiration date on the listing or expected that it would be removed from the website after a reasonable period of time." *Id*. at 13. Even if any of the available exceptions applied, Indeed argues, "the [Stored Communications Act] does not require providers to disclose the communications." *Id*. at 12 (noting that 18 U.S.C. § 2703 lists exceptions under which a provider "may," but is not required to, disclose communications).

In reply, the Town of Marlborough reiterates that Indeed has not shown any undue burden because it has an employee tasked with responding to discovery requests, the scope of the subpoena has been narrowed, and Indeed's estimate of time required to fulfill the request can be shortened because the Town of Marlborough does not need it to review the job postings for relevance. Reply to Opp'n to Mot. Compel at 2. It also argues that it can only obtain these documents, which the Town of Marlborough requires to demonstrate that suitable work existed, from Indeed, because Indeed "has not taken the position that another entity maintains the job postings it published." *Id*. at 3.

The Town of Marlborough notes too that Mr. Foley "refused to execute Indeed's authorization form that would permit Indeed to disclose [Mr. Foley's] user information, if any existed." *Id*. at 3–4. Even if Mr. Foley had agreed, however, the user information would not help

because it does not reveal jobs that were suitable but that Mr. Foley did not apply for. *Id*. at 4. It also argues that it is not requesting expert testimony but rather "request[ing] Indeed produce information previously posted on its website that is no longer available to the public." *Id*. The documents, therefore, are allegedly not protected by the Stored Communications Act, because they were available to the public when posted and then were made unavailable by Indeed because the posts had expired. *Id*. at 5 (citing *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 668–69 (D.N.J. 2013)).

The Town of Marlborough responds that the documents requested are not duplicative and cumulative because Mr. Foley "specifically testified that 'Indeed 'sounded familiar to him when he was asked whether he used Indeed to look for work." *Id*. at 4–5. Because Indeed has not provided any documents, no one can confirm whether the job postings on Indeed's website are duplicative of other job postings received from other third parties. *Id*. Even if they are duplicative, the postings are important because Mr. Foley testified to being familiar with Indeed. *Id*. at 5.

The Court disagrees.

An evaluation of undue burden requires the Court to weigh the burden to the subpoenaed party against the value of the information to the serving party. *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005) (citations omitted); *accord Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 299 (S.D.N.Y. 2009) (citations omitted). In assessing burden, a court considers factors such as "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed," and it also "give[s] special weight to the burden on non-parties of producing documents to parties involved

in litigation." *Travelers Indem. Co.*, 228 F.R.D. at 113 (internal quotation marks omitted) (citing *Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41–42 (1st Cir. 2003); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998); *U.S. v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)) Ultimately, it is within the Court's discretion to determine "whether undue burden is present." *Aristocrat Leisure Ltd.*, 262 F.R.D. at 299 (citing *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003)).

The Town of Marlborough's request is overly broad. They ask Indeed to produce job postings for two categories of jobs in 41 towns from March 8, 2019 to the present. This is an overly broad request for the goal of demonstrating that there were job opportunities for which Mr. Foley qualified but for which he did not apply. This is particularly true considering that the Town of Marlborough already has deposition testimony from Mr. Foley stating that he did not "believe that [he has] done too many applications," Ex. G to Mot. to Compel at 8, ECF No. 95-10 (Oct. 1, 2021), that the Town of Marlborough has not confirmed that Mr. Foley did use Indeed to review job postings and submit applications, *see* Ex. H to Mot. to Compel at 8, ECF No. 95-11 (Oct. 1, 2021) ("Q: Have you used Indeed? A: Indeed sounds familiar. Q: Did you use it? A: I believe so. I believe Indeed might be one I think I get an email from."), and the Town of Marlborough's success in acquiring similar records from other employment websites. Even with a narrowed scope as to time, geography, and job titles, the Town of Marlborough appears to be seeking data that Mr. Foley may not have even seen or considered on Indeed or any other competitor's platform. Should the Town of Marlborough want information about jobs that Mr. Foley could have reasonably considered, it could attempt to gather this information from Mr. Foley's e-mail subscriptions and job application records, without requiring Indeed to expend days of labor to produce data on job postings across the state of Connecticut.

Additionally, it is not even clear that the data provided would be reliable and produce information that would allow the Town of Marlborough to claim with certainty that relevant jobs existed. One of Indeed's Senior Data Risks Analysts states that the "list of jobs . . . retrieved is likely unreliable for a number of reasons" including that deleted job posts would not be retrievable in the search and edited job posts would also override any original listings. Kim Decl. ¶ 9.

The searches would also be unduly burdensome, requiring Indeed to allocate many days of labor to compile just a fraction of the information requested. One search covering a one-year period and eight towns would take approximately 15 hours to search. The Town of Marlborough's offer to not require review for relevance is unavailing, because the Court will not force Indeed to hand over unreviewed data from its proprietary systems. Neither the offer to "share in the reasonable costs associated with retrieving" the requested information nor the fact that Indeed employs someone to respond to discovery requests make this request sufficiently less burdensome. Tasking such an individual with days of searches would force Indeed, a non-party, to allocate a paid employee's hours toward a case in which Indeed is not a party, based on Mr. Foley's having said that he "might" have received e-mails from them, and away from cases in which the company may be involved as a party. This goes to the essence of the weight placed on Indeed's non-party status. *See Tucker*, 281 F.R.D. at 92 ("Within this Circuit, courts have held nonparty status to be a 'significant' factor in determining whether discovery is unduly burdensome."); *Travelers Indem. Co.*, 228 F.R.D. at 113; *Solarex Corp. v. Arco Solar, Inc.,* 121 F.R.D. 163, 179 (E.D.N.Y.1988), *aff'd*, 870 F.2d 642 (Fed. Cir. 1989) ("Of significance, . . . in balancing the competing hardships, is the Society's status as a non-party to this litigation. Under the authorities, this factor is significant in 'determining whether compliance

[with a discovery demand] would constitute an undue burden.'") (internal citations omitted); *see also Cusumano*, 162 F.3d at 717 ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs[.]").

Since the motion to compel is denied on the basis of the undue burden that it would impose on Indeed, the Court will not address the parties' arguments concerning the Stored Communications Act or whether the request is an improper attempt to use Indeed as an unretained expert.

Accordingly, the motion to compel will be denied.

IV.   **CONCLUSION**

For the foregoing reasons, the Town of Marlborough's motion to compel is **DENIED**. Defendants' motion for summary judgment is **DENIED**. And Plaintiff's motion for summary judgment is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut this 29th day of August, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE